(April 19, 1911.)

## STATE, Respondent, v. FRED GRUBER, Appellant.

### [115 Pac. 1.]

INDICTMENT FOR HOMICIDE CHARGED IN TWO COUNTS—CRIMINAL LAW—
CONTINUANCE—HOMICIDE COMMITTED IN THE PERPETRATION OF
ROBBERY—MALICE AND PREMEDITATION—ADMISSION OF EVIDENCE—
DEFENDANT AS WITNESS—CROSS-EXAMINATION OF DEFENDANT—
PLEA OF INSANITY—INSTRUCTION AS TO INSANITY—PRESUMPTION
OF GOOD CHARACTER—INSTRUCTION AS TO CHARACTER—INSTRUCTION
AS TO REFUSAL TO TESTIFY—STATEMENTS BY PROSECUTOR.

(Syllabus by the court.)

1. Under the provisions of sec. 7681, Rev. Codes, an indictment
or information must charge but one offense, but the same offense
may be set forth in different forms under different counts, and
where the offense may be committed by the use of different means,
the means may be alleged in the alternative in the same count.

2. In an information charging murder in the first degree, the
prosecutor may charge the same offense in two counts, one count
alleging the murder to have been committed wilfully, deliberately
and with malice aforethought, and the other count charging that
the murder was committed in the perpetration of, or attempt to
perpetrate, robbery. In the latter case, proof that the murder
was committed in the perpetration of, or attempt to perpetrate,
robbery brings the case within the definition of murder in the first
degree, as contained in sec. 6562, Rev. Codes, and such proof sup-
plies the place of proof of deliberation and premeditation.

3. An application for a continuance in a criminal case is ad-
dressed to the sound discretion of the trial court, and there is
no abuse of discretion in denying such application where the party
applying fails to show that if the continuance should be granted
he could procure material evidence tending to establish his de-
fense, which he could not reasonably expect to produce unless such
continuance should be granted.

4. Where an information charges that murder has been com-
mitted in the perpetration of, or attempt to perpetrate, robbery,
it is proper to show that the deceased had money or valuables on
his person prior to his death, and that his money or other valu-
ables had been taken from him; and it is likewise competent to
show that the defendant was in impecunious and necessitous cir-
cumstances prior to the time of the homicide, and that he had

money soon thereafter, or that he had property or valuables soon after the homicide which had belonged to the deceased.

5. Certain evidence as to the identification of the watch claimed to have been taken from the body of the deceased, and the evidence of a witness in identifying handwriting, examined, and *held,* that it was properly admitted.

6. Under the provisions of sec. 6079, Rev. Codes, a witness may be cross-examined by the opposite party "as to any facts stated in his direct examination or connected therewith."

7. Where the defendant testified to going to a specified place or city with another, and to spending the night with such person, and gave no further testimony as to his movements or when he left such place, it was not error to permit the prosecuting attorney on cross-examination to ask the defendant when he left the place to which he and the other party had gone.

8. Where a defendant became a witness in his own behalf and testified concerning his early life, and as to his acquaintance with a third party, and concerning a trip taken by him and a party who was afterward murdered, and made no reference to any property owned by the deceased, and no mention of a transaction in which certain property claimed to have belonged to the deceased was pawned, it was error for the court to allow the prosecuting attorney to ask the defendant on cross-examination if he gave a pawn ticket to a third party for certain of the deceased's property.

9. It is not error for the trial court to refuse to give an instruction to the jury as to the law covering the defense of insanity where there is no evidence introduced on the part of the defendant tending to show that he was insane at the time of the commission of the offense.

10. It is not error for the trial court to refuse to give to the jury an instruction to the effect that the law presumes that the defendant sustained a good reputation prior to the commission of the alleged offense, where no evidence has been introduced touching his character or reputation, and no issue has been made touching his reputation with reference to any trait or quality or in any respect.

11. Under the constitution, sec. 13, art. 1, and the statute, sec. 7357, Rev. Codes, no person can be compelled in a criminal action to become a witness against himself, and the court should instruct the jury in a proper case that no presumption can be raised against the defendant by reason of his refusal to testify; but where the defendant voluntarily submits himself as a witness in his own behalf, he may be cross-examined by the state, subject to the same rules and regulations governing cross-examination that apply to other witnesses.

12. Where the court permitted the prosecutor to ask a question on cross-examination which was not proper cross-examination, and it appears that the question was one that did not prejudice the defendant's rights, and did not prejudice him in any substantial manner, it was not error for the trial court to refuse to instruct the jury that the defendant had properly declined to answer such question, and that his refusal to answer should not be construed against him.

13. Where the conduct of a prosecutor in making certain statements in the course of his argument to the jury is assigned as error, the defendant should set forth in his statement or bill of exceptions the language of the prosecuting attorney with sufficient certainty and definiteness, together with the circumstances and conditions under which it was made, and the context thereof, to enable this court to determine whether or not the same was prejudicial to any substantial right of the defendant.

14. Evidence in this case examined and *held* sufficient to justify the verdict and judgment.

APPEAL from the District Court of the Eighth Judicial District, in and for the County of Kootenai. Hon. Robt. N. Dunn, Judge.

Prosecution for murder in the first degree. Conviction had and defendant appealed. *Affirmed.*

McBee & La Veine, for Appellant.

Where an information describes an article with particularity, the proof will be held to that article so particularly described, and the allegation of the fifteen jeweled watch was not supported by the testimony of a watch with eleven jewels. (*Morgan v. State,* 61 Ind. 447; *Turner v. State,* 50 Tenn. 452; *Harris v. State* (Tex. Cr. App.), 30 S. W. 221; *State v. Kube,* 20 Wis. 217, 91 Am. Dec. 390.)

"The defendant in a criminal action, who has testified in his own behalf, can only be cross-examined by the state as to facts stated on his direct examination or connected therewith." (*State v. Larkins,* 5 Ida. 200, 47 Pac. 945; *Evans v. O'Connor,* 174 Mass. 287, 75 Am. St. 316, 54 N. E. 557; *People v. Arrighini,* 122 Cal. 121, 54 Pac. 593.)

Instructions Nos. 34, 35, and 38 refer to the question of insanity as governed by heredity and also tender to the jury an instruction in regard to the effect of the suicide of defendant's father. These instructions correctly state the law and should have been given. (Brown, Medical Jurisprudence of Insanity, secs. 524, 525; Wharton and Stille, Medical Jurisprudence, p. 93; *The Arrowsmith Case,* 1 Am. Law Reg. 353; *People v. Smith,* 31 Cal. 466.)

It was error for the prosecuting attorney to state to the jury in argument that, "They might acquit the defendant and allow him to go out and kill somebody else." (*State v. Irwin,* 9 Ida. 35, 71 Pac. 608.)

D. C. McDougall, Atty. Gen., O. M. Van Duyn and J. H. Peterson, Assts., for Respondent.

Two offenses are not charged, but one offense is charged, and the second alleged offense, as shown by the second count in the information, to wit, robbery, is only for the purpose of showing the means which go to make the said offense murder in the first degree. (Wharton on Homicide, p. 876.)

An application for continuance is addressed to the sound judicial discretion of the court, which will not be revised unless abused. (Citing authorities cited in the opinion of the court.)

Every fact from which the jury may legally deduce or infer the guilt of the accused shall be submitted, when, taken in connection with these facts or all the other facts, its relevancy is made to appear. (Sec. 323, Underhill, Criminal Evidence; sec. 584, 3d ed., Wharton on Homicide; *State v. Reed,* 53 Kan. 767, 42 Am. St. 322, 37 Pac. 174; *Jenkins v. State,* 35 Fla. 737, 48 Am. St. 267, 18 So. 182.)

The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith. (Sec. 6079, Rev. Codes; *State v. Anthony,* 6 Ida. 383, 55 Pac. 884; *State v. Larkins,* 5 Ida. 200, 47 Pac. 945; *People v. Arrighini,* 122 Cal. 121, 54 Pac. 591; *People v. Meyer,* 75 Cal. 383, 17 Pac. 431; *People v. Freshour,* 55 Cal. 375; *People v. Davenport,* 13 Cal. App. 632, 110 Pac. 318; *People*

*v. Gallagher,* 100 Cal. 474, 35 Pac. 80; *People v. Schmitz,* 7 Cal. App. 330, 94 Pac. 407–419; *People v. Rozell,* 78 Cal. 91, 20 Pac. 36.)

The prosecuting attorney has the right to state his view of what the evidence shows and the conclusion to be drawn therefrom. (*People v. Romero,* 143 Cal. 458, 77 Pac. 163.)

AILSHIE, Presiding J.—The appellant was prosecuted on information by the county attorney on the charge of the murder of one John H. Billings, and was convicted of murder in the first degree and sentenced to be hanged. This appeal is from the judgment and an order denying a motion for a new trial.

In order to intelligently deal with the errors assigned, it will be necessary to briefly state some of the leading facts which are disclosed by the record, and on which the conviction was had. The defendant was an electrician in the employ of a carnival show company, and he seems to have been generally known by the name of Fred George. On about the 3d of December, 1909, John H. Billings was working at his trade as a carpenter in the fair grounds of the apple show in Spokane. Defendant was then a young man of the age of about twenty years, and was at that time in a poor financial condition; in fact he was apparently without any money. At that time he had in his possession what purported to be a letter from a man named Harry George, whom he represented as owning a chicken ranch in the neighborhood of Coeur d'Alene City in this state. Billings was a man of the age of about forty-five years, and he had a small sum of money, somewhere perhaps from $35 to $50.

On the latter date, December 3d, at the solicitation of defendant and for the purpose of securing employment, Billings went with the defendant to Coeur d'Alene City to see Harry George and secure work on his chicken ranch. They arrived at Coeur d'Alene City and stopped at the Coeur d'Alene Inn. During the evening of that day they made a number of inquiries at different residences as to the location of the Harry George chicken ranch. They were unsuccessful in locating

George, or learning anything of his whereabouts, and later in the evening they returned to the hotel, and retired for the night, both occupying the same room and the same bed. ·The next morning they renewed their search for Harry George; they went into the outskirts of the town and beyond on the east side, and were seen by several persons on the forenoon of that day. One witness testified that they came to her home two and one-half miles east of Coeur d'Alene at fifteen minutes past 11 o'clock on the forenoon of December 4th. This was the last time that the defendant was seen in that vicinity, or in fact in the state, on that day. It was also the last time, so far as the evidence discloses, that anyone saw Billings prior to his death. About 4 or 5 o'clock on the afternoon of December 4th, LeRoy Mix, a small boy living in the east end of Coeur d'Alene City, found a black hat lying in the middle of the street, which was afterward identified as the hat that Billings was wearing that morning. H. E. Seagreaves, in going to his home in the east end of the city, saw a trail in the snow, running across the road, which indicated that something heavy had been dragged across the road. The next day Luther Mashburn, a small boy, on his way to school observed the same trail. This boy seems to have told some of his classmates at school about the matter, and that afternoon on the way home he, in company with a couple of other school boys, followed the trail, and discovered the body of Billings about seventy-five or one hundred feet from the road, partially covered with some stumps and logs. They reported this fact to the sheriff's office, and the body was taken and identified, and an inquest was thereafter held.

At about 2:50 P. M. of this same day, December 4th, the watch which was afterward identified as Billings' watch was pawned with a pawnbroker in the city of Spokane, and it was claimed by the state that this was done by the defendant. The person who pawned the watch gave the name as Fred George, and the description of the person who deposited the watch with the pawnbroker corresponds with the description of the defendant. The contract with the pawnbroker was signed by Fred George, and the signature is identified as that of the

defendant, and it has nowhere been disputed by the defendant. The defendant was subsequently, on or about the 15th of December, located at Lewiston, and was taken back to Kootenai county for trial.

At the inquest held over the body of Billings it was found that three wounds had been inflicted on the head, two of which were sufficient to have caused death; that the wounds appeared to have been inflicted with a blunt instrument. A club broken in three pieces was found near the body; this was similar to a club or stick the defendant was using as a walking stick when he was seen with Billings in that part of the city. It also appeared that the deceased had been robbed of everything of value he had in his pockets, and the pockets were turned wrong side out. His watch was gone and he had no money in his pockets. No such person as Harry George was produced as a witness and no contention was made at the trial that there was such a person, or that there was in fact any chicken ranch about Coeur d'Alene corresponding to the purported Harry George ranch.

The first question presented is the action of the court in overruling the demurrer to the information. The prosecuting attorney in his information charged the defendant with the same offense in two counts. The first count charged, in the usual and ordinary form of criminal pleading, that the defendant had wilfully, deliberately and with premeditated malice aforethought, killed and murdered one John H. Billings, etc. In the second count the same offense was charged, but it was charged that the offense was committed in the perpetration of the crime of robbery, and the information in this count set out in detail the description of the watch that the defendant was charged with having taken, and that the murder was committed in the perpetration of the crime of robbery. The defendant urged in support of his demurrer that two separate and distinct offenses had been charged in the information—one consisting of murder, and the other consisting of robbery.

Our statute has defined murder (sec. 6560, Rev. Codes), and express and implied malice (sec. 6561, Rev. Codes), and

sec. 6562, Rev. Codes, defines the degree of murder. The latter section says: "All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, or mayhem, is murder of the first degree. All other kinds of murder are of the second degree."

Sec. 7681, Rev. Codes, authorizes a single offense to be charged in different forms and under different counts, and reads as follows: "The indictment must charge but one offense, but the same offense may be set forth in different forms under different counts, and, when the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count."

It will be observed that under the provisions of sec. 6562, *supra,* a murder committed in an "attempt to perpetrate . . . . robbery . . . . is murder in the first degree," irrespective of any deliberation or premeditation. (*People v. Mooney,* 2 Ida. 17 (24), 2 Pac. 876; *State v. Phinney,* 13 Ida. 307, 89 Pac. 634, 12 L. R. A., N. S., 935, 12 Ann. Cas. 1079.) The prosecutor no doubt thought there might be some question as to his proving deliberation and premeditation on the part of the defendant in the commission of this particular offense, but at the same time was impressed with the idea that the homicide had been committed in the perpetration of a robbery, and therefore concluded that he would charge in a separate count that the killing was done in the perpetration of robbery, and that he would thereby save the state the necessity of making distinct and separate proof as to deliberation and premeditation. This was proper, and clearly within the purview of the statute, secs. 7681 and 6562, *supra.* (See Wharton on Homicide, p. 876.)

Appellant assigns as error the action of the court refusing a continuance in the case.

It appears that the defendant was without means to employ counsel, and that the court appointed an attorney to defend him. This attorney subsequently withdrew from the case, and

Mr. McBee, the present counsel, was appointed by the court. An application was made for a continuance in order to enable counsel to prepare for trial. This application appears to have been granted; at any rate, the plea of "not guilty" was entered on January 27th, and no further action was taken until about the 26th of February following. On the latter date a new application was made supported by affidavits; the substance of this application was, that the defendant was without means to investigate the case, and that counsel was of the opinion that he should properly interpose the defense of insanity. The affidavits tended to show that the defendant's father had been a man of evil associations, that he had brought the boy up to the age of six or seven under the worst kind of influences and surroundings, and when the boy was six or seven years old the father shot and killed defendant's mother, and then shot his brother, after which he committed suicide.

Nothing was disclosed by the affidavits which tended to show that the defendant was insane, or irresponsible for his acts. However degrading his early surroundings and associations may have been, and however blunted and distorted his moral sensibilities were, it is, nevertheless, very clear from the record that he was not an insane man. It was not shown by the affidavits that a continuance would enable the defendant to secure evidence that would be of any assistance to him on the trial. More than six months after his conviction a motion was made for a new trial, but no showing was made whatever as to the discovery in the meanwhile of any new evidence or evidence that would be of value or assistance to him, should a new trial be granted. An application for a continuance is addressed to the sound judicial discretion of the court, and the action of the court in refusing a continuance will not be disturbed on appeal, unless it is made to appear to the appellate court that there has been an abuse of discretion on the part of the trial court. (*Territory v. Guthrie,* 2 Ida. 432 (398), 17 Pac. 39; *State v. St. Clair,* 6 Ida. 109, 53 Pac. 1; *State v. Rooke,* 10 Ida. 388, 79 Pac. 82; *State v. Wetter,* 11 Ida. 438, 83 Pac. 341; *State v. Steers,* 12 Ida.

174, 85 Pac. 104.)    The motion for a continuance was properly denied.

Counsel for defendant made a number of objections to the admission of certain evidence, and assigns the action of the court in overruling his objections as error.    The first objection was made to the introduction of evidence showing that Billings had money in his possession on or about the date he and defendant went to Coeur d'Alene City.    It was proper to admit this evidence.    The state showed, in the first place, that Billings had been robbed, that his pockets had been rifled. This had evidently been done immediately after Billings had received the fatal blow.    It was also shown that at that time, and immediately preceding that date, the defendant had no money—or if any, a very small sum.    The letter written by him to his friend in Boise indicated that he was broke; it also indicated that he was expecting to make a raise of about $50 on a trip he was planning to take.    He did not disclose in the letter the nature of the trip, or the place to which he was going.    The letter disclosed the fact that he was in hard financial circumstances.    He was subsequently apprehended in the city of Lewiston.    It does not appear how he came to Lewiston.    It was evident at once that it had taken some money to enable him to make the trip and meet his expenses in the meanwhile.    These were proper matters to submit to the jury for their consideration.

Appellant also complains of the action of the court in admitting evidence identifying a watch owned by Billings, and subsequently pawned by defendant with a pawnbroker at Spokane.    The information described the watch as a fifteen-jewel Waltham watch; the evidence showed that the watch was an eleven-jewel Waltham watch.    Witnesses positively identified the watch as being Billings' watch, and the only discrepancy consists in the conflict between the allegations of the information and the testimony of the witnesses as to the specific description in this respect.    This was immaterial.    The watch was identified as Billings' watch, and on that point there is no conflict in the evidence.    It makes no difference whether it was an eleven-jewel watch or a fifteen-jewel watch, if it

was Billings' watch, and the defendant subsequent to Billings' death pawned the watch; it was a circumstance proper and very material to be submitted to the jury for their consideration. Witnesses might easily be mistaken as to the number of jewels in a watch, and still be certain as to the identity of the particular watch. As we have before said, this was not a prosecution for robbery or larceny; the evidence of robbery was only introduced in the case for the purpose of supplying evidence of deliberation and premeditation.

There is no merit in the objection made by the appellant to the evidence of the witness Platt as a handwriting expert, in identifying the handwriting and signature of the defendant to the letter written in the latter part of November to a Mrs. Ward at Boise. This was the letter to which reference has heretofore been made. It seems in this connection that Platt's name was not originally indorsed on the information, and that the prosecuting attorney did not know at the time of filing the information that he would want to use the witness for that purpose. He asked leave to indorse his name on the information, and made a showing to the effect that he had not previously known that he would want to use the witness. The court permitted his name to be indorsed on the information at that time, and allowed him to testify. There was no error in this action of the court. The witness appears to have only testified as a handwriting expert in identifying the writing and signature of the defendant. This in no way surprised or prejudiced the defendant.

The letter written to Mrs. Ward, being once identified as having been written by defendant, was properly admissible for the purpose of showing the defendant's financial condition, his prospects and intentions, and the fact that he was intending to take a trip somewhere; that on such trip he was intending to make a raise of some money, apparently about the sum of money that Billings was shown to have had at the time he went with defendant to Coeur d'Alene City.

The most serious question presented on this appeal revolves about the action of the court in its ruling as to the scope of cross-examination which should be allowed the state

in cross-examining the defendant. After the state had rested its case the defendant took the stand and testified—first, as to his early life and associations, and the conditions under which he was reared; second, his acquaintance with one Harry George, and as to a letter which he had received from George concerning a chicken ranch owned by the latter; and third, the trip with Billings to Coeur d'Alene City on December 3d, and the events and happenings of that afternoon, evening and night at Coeur d'Alene City, including the search and inquiry made in the vicinity of Coeur d'Alene, or between Coeur d'Alene and Fernan Lake, in order to locate the Harry George chicken ranch; and the further fact that the defendant and Billings stopped over night at the Coeur d'Alene Inn and occupied the same room and bed at the hotel, and that he saw Billings the next morning on arising. Defendant closed his testimony with the morning of December 4th. He gave no account of himself or Billings later than, or subsequent to, rising on the morning of December 4th at the Coeur d'Alene Inn.

The state then cross-examined defendant, covering all the matters about which he had testified on his direct examination. In course of his cross-examination he said: "I stayed in Coeur d'Alene Friday night and Billings was with me. We slept together that night. I next saw him the next morning when I woke up." The prosecuting attorney then asked the question, "When did you leave Coeur d'Alene?" to which counsel for defendant objected, on the ground that it was not proper cross-examination. The court overruled the objection, and counsel took exception to the ruling. The witness declined to answer the question, or any other question, concerning his movements or whereabouts on December 4th. It is now urged that the court erred in permitting the witness to be examined as to matters occurring on the 4th, for the reason that it was not proper cross-examination. The correctness of this rule must be measured and determined by the statute, sec. 6079, Rev. Codes, which reads as follows:

"The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected there-

with, and in so doing may put leading questions; but if he examine him as to other matters such examination is to be subject to the same rules as a direct examination."

It will. be observed from a consideration of the foregoing provisions of the statute that cross-examination is limited to facts stated in the direct examination "or connected therewith." It seems to us that the question as to when the defendant left Coeur d'Alene was very intimately connected with his statements made on examination in chief. He had testified to going to Coeur d'Alene City with Billings and had given a somewhat detailed account of his movements from the time he went until the morning of the 4th. The state had been unable to prove positively and definitely as to just when he did leave Coeur d'Alene, but it had been well established that he left Coeur d'Alene, and apparently that he had left about noon of the 4th. We cannot say that it was error to ask him on cross-examination when he left Coeur d'Alene; on the other hand, we are satisfied it was proper cross-examination. (See *State v. Larkins*, 5 Ida. 200, 47 Pac. 945; *State v. Anthony*, 6 Ida. 383, 55 Pac. 884.)

Further along in the cross-examination of defendant the prosecuting attorney asked him about his acquaintance with Harry George, and when he saw George last. The defendant, in answer to these questions, among other things, said: "I did not see him when I got back from Coeur d'Alene on this trip with Billings. He was not the first man I met when I got off the train." Thereupon the prosecuting attorney asked him: "Did you give him the pawn ticket?" to which defendant's counsel objected, on the ground that it was not proper cross-examination. The court overruled the objection, and the defendant refused to answer. This action of the court is assigned as error.

It should be remembered that the state had already proven that about 2:50 P. M., December 4th, the defendant, under the name of "Fred George," had pawned the Billings watch with a pawnbroker in Spokane named Goldblatt. The duplicate pawn ticket had been introduced in evidence; it was to this ticket that the prosecuting attorney referred in

the question above stated. The defendant had made no reference to the watch or the pawn ticket, or any part of that transaction in his evidence in chief; this question did not, therefore, relate to any matter concerning which the defendant had testified, and was not proper cross-examination. (*People v. Arrighini,* 122 Cal. 121, 54 Pac. 593.) It was error for the court to overrule the objection to this question.

We fail to see, however, how the defendant could have been prejudiced by this question, for the reason that the state had already proven the pawning of the watch, and that the watch was deposited with the pawnbroker by the defendant. (See secs. 8236 and 8070, Rev. Codes; *State v. Larkins,* 5 Ida. 212, 47 Pac. 945.) This evidence has not been disputed in any way, and was not disputed by the defendant. It is true that the defendant was placed under the necessity of either answering the question or exercising his right of refusing to answer, and that he did accordingly decline to answer the question. This may have tended to confirm the jury in their belief that the defendant had seen George and given him the pawn ticket, or else he would have answered in the negative. If he had not done so then it was his own fault in not answering the question in the negative; if he had done so, we do not see where he was injured or prejudiced by not answering the question at all. These observations are made in view of the fact as above stated, that it had already been established by competent evidence that he had pawned the watch and received the pawnbroker's ticket for the same.

Appellant next complains of the action of the court in refusing to give a number of instructions requested on the part of the defendant. Defendant's requests, Nos. 34, 35 and 38, define the law applicable to the defense of insanity in such cases. The court refused to give the instructions, and while it does not affirmatively appear from the record why he refused the instructions, we are justified in concluding that he did so because there was no defense offered, or evidence submitted in the case tending to establish the insanity of defendant. Counsel for the defendant did not

introduce any evidence in the case which tended in the slightest degree to even suggest that the defendant was laboring under any mental disability; that he was insane, or had any tendency to insanity. The defendant had testified to his father's vicious traits and propensities, and this evidence was probably submitted to the jury for the purpose of showing that the defendant had been brought up under adverse circumstances and conditions, and that his father before him was degenerate and of vicious instincts. This evidence might tend to show that the defendant was criminally or viciously inclined by heredity, but it did not even tend to establish insanity. Criminality and insanity are two very different things, although the latter is sometimes resorted to as a cover or shield to protect one who harbors the former.

Defendant's request No. 37 was with reference to the character which a defendant is presumed to have, and reads as follows:

"The court instructs the jury that the character of the accused person is, in law, presumed to be good until the contrary appears from the evidence, and he is under no obligation to prove a good character until his character is, in some way, attacked, and the jury will not be justified in drawing any inference unfavorable to the defendant, from the fact that he has offered no proof as to good character in this case."

The court refused to give this instruction. No evidence was introduced touching the defendant's reputation. He did not offer any evidence tending to show his general reputation in any respect, and without his doing so the state could not assail his reputation. For some reason, however, the defendant requested the court to instruct the jury, as above set out, to the effect that the law presumes every one to have a good reputation—or rather a good character, as stated by the requested instruction. It is a well-recognized rule of law that the character—or more correctly speaking, the reputation—of every one is presumed to be good, and this is true of one who is accused of the commission of a

crime. He is presumed to bear a good reputation. No issue, however, as to the reputation of the defendant can arise until he raises it himself. The state cannot introduce evidence to show that a defendant bears a bad reputation until he first puts his reputation in issue. If he feels that he can establish by his acquaintances and neighbors the fact that he bears a good reputation, the law permits him to introduce such evidence, and then the state may show the contrary if it can do so. (*State v. McGreevey*, 17 Ida. 468, 105 Pac. 1047.) In such cases an issue arises, and it is proper for the court to instruct the jury as to the law on the subject. Until such an issue arises, however, there is no occasion for an instruction on the subject of the defendant's good character or reputation. We do not see where any error can arise by reason of the court's declining to give an instruction on this subject when there was no evidence introduced either to support or impeach the defendant's reputation.

In *Addison v. People*, 193 Ill. 405, 62 N. E. 235, an instruction was requested by the defendant to the same effect as the instruction requested in this case. The trial court refused to give the instruction, and the action of the court was assigned as error on appeal. The supreme court of Illinois, in commenting on the question, said:

"Defendant had a right to put his reputation as a law-abiding citizen in issue if he saw fit. (*Jupitz v. People*, 34 Ill. 516.) In such case it would be a proper subject for evidence on each side. If he should establish the fact that he was of good character as a law-abiding, peaceable citizen, the jury would be bound to take it into account in making up their verdict; but if he should offer such evidence the people could offer evidence to the contrary, and would have an opportunity to prove, if they could, that his character and reputation were bad. Defendant did not choose to put his reputation in issue or prove that it was good, but sought by the instruction all the benefit of an affirmative finding of such fact without proof or an opportunity to combat the claim or prove the negative. If the instruction were the law, a defendant need never prove good reputation, but

could take the benefit of proof, which perhaps he could not make.'' (See Brickwood's Sackett on Instructions, vol. 3, sec. 4334.)

The other instructions requested by defendant, except No. 46, were all substantially covered by the instructions given by the court, and it was therefore not error to refuse such requests.

Instruction No. 46, requested by the defendant and refused by the court, is as follows:

''The jury is instructed that under the constitution and laws of the state of Idaho, no person can be compelled to give testimony against himself in a criminal action. In this case the defendant has refused to answer certain questions asked him on the witness-stand. In that regard you are instructed that he had a right so to do and that the jury shall not presume from said fact that the answers to said questions would be unfavorable to the defendant, and you are to render your verdict in this case the same as if no questions had been asked and no refusal to answer had been made by the defendant.''

The request for this instruction was evidently prompted by the controversy which arose over the cross-examination of the defendant as hereinbefore considered. Under the constitution, sec. 13, art. 1, and the statute, sec. 7357, Rev. Codes, ''No person can be compelled in a criminal action to become a witness against himself,'' but the authorities are uniform to the effect that after he has voluntarily made himself a witness on his own behalf, he is subject to the same rules of cross-examination that apply to all other witnesses. In this case the defendant did not see fit to go into all the matters touching his defense with which he must have been familiar. He also refused to answer some of the questions asked him on cross-examination. As we have indicated above, one of the questions asked him was proper and ought to have been answered. The other was not a proper question on cross-examination. It would not have been a correct statement of the rule applicable to the facts in this case to have told the jury that the defendant had a right to

decline to answer both of these questions that had been put to him, and that the jury should not raise any unfavorable presumption against him on account of his refusal to answer both questions. It would, on the other hand, have been proper and correct for the court to have given that instruction to the jury with reference to the pawn ticket. The instruction covered both questions and in that respect was incorrect. For the same reason, however, that we hold that the question was not of a prejudicial character and did not injure the defendant, we hold that the refusal of the court to give the instruction was also harmless, and does not afford grounds for reversal of the judgment. It would have been entirely proper for the court to have instructed the jury that the defendant was not required to become a witness in the case, and that they should not raise any unfavorable presumption against him by reason of his refusal either to testify at all, or his refusal to go into any distinct part of his defense or any particular transaction in connection therewith. (See *State v. Levy*, 9 Ida. 498, 75 Pac. 227.) The failure of the court to give an instruction on this question will not justify this court in reversing the judgment.

In the course of the argument to the jury by the prosecuting attorney, C. H. Potts, the record says: "He stated, among other things, that if counsel for defendant in his argument to the jury had advanced certain other theories in this case which said C. H. Potts specified, the jury might then acquit the defendant and allow him to go out and kill somebody else, to which statement of the prosecuting attorney the defendant, by his counsel, then and there duly excepted."

Appellant complains of these remarks made by the prosecutor in the course of his argument, and assigns the same as error. In support of this assignment the appellant relies on the rule announced by this court in *State v. Irwin*, 9 Ida. 35, 71 Pac. 608, 60 L. R. A. 716. In this case the record does not purport to contain the exact language used by the prosecuting attorney. It only purports to give the substance of some statement made by the prosecutor in the course of

his argument. This is too indefinite and uncertain for the court to consider it in the light of a reversible error. In order for this court to intelligently pass on any alleged prejudicial statement made by the public prosecutor, it is necessary for the court to be advised of the language used or its substance, and the connection in which it was used; otherwise, this court cannot say that the statements made were not justified by the record, or that they were appeals to the prejudice and passions of the jury for which a judgment should be set aside. The rule announced by this court in *State v. Irwin, supra,* states the law on this subject as we view it, and any case falling within the rule there announced should be dealt with in the same manner that that case was met. This, however, is not such a case.

The last question raised by the appellant is the alleged insufficiency of the evidence to support the verdict and judgment. It is urged that the evidence is wholly circumstantial, and that it is not of such a conclusive and convincing character as to establish the defendant's guilt beyond all reasonable doubt, and to preclude every other reasonable hypothesis except that of the guilt of the defendant. We shall not further review the evidence in this opinion. We have examined it very closely, and are convinced that it was sufficient to justify the jury in returning a verdict of guilty. It is true that the evidence is circumstantial, but those circumstances are very strong, and would naturally lead a reasonable juror to the unavoidable conclusion that the defendant committed the homicide as charged in the information.

The judgment must be *affirmed,* and it is so ordered.

Sullivan, J., and Woods, District Judge, concur.