287 P.2d 425

STATE of Idaho, Plaintiff-Respondent,

v.

Floyd JOHNSON, Defendant-Appellant.

No. 8202.

Supreme Court of Idaho.

June 29, 1955.

Rehearing Denied Sept. 16, 1955.

James W. Blaine, Charles R. Donaldson, Boise, for appellant.

Graydon W. Smith, Atty. Gen., J. R. Smead, Asst. Atty. Gen., John M. Sharp, Sp. Asst. Atty. Gen., H. S. Forbush, Pros. Atty., Driggs, for respondent.

SMITH, Justice.

Respondent charged appellant with burglarizing the Tetonia Club in Tetonia, during early morning of December 29, 1952. Appellant stood trial and a jury found him guilty of burglary of the first degree. He appealed from the judgment of conviction and the order denying his motion for a new trial.

The entry of the Tetonia Club and the taking of four slot machines therefrom were observed by Mr. and Mrs. Berry living about 130 feet from the front of and across the street from the Tetonia Club building, who notified law enforcement officers by telephone of such entry.

About 4:30 o'clock A. M., December 29, 1952, during stormy weather with snow, a station wagon, without lights, driven on its driver's left hand side of the road, stopped at a point almost across the street from the Tetonia Club. Two men got out; they did not appear to be carrying any tools. They crossed the street and without hesitation entered the club building; shortly they came out of the building, each with a slot machine which he carried across the street and put into the station wagon. They returned to and entered the club building and came out, and each again carried a slot machine which he placed in the vehicle.

The two men then got into the station wagon and drove away without lights toward Driggs, and did not turn on the lights until at a turn in the road, after traveling about a city block.

The sheriff of Teton County and his deputy, who was also the marshal of Driggs, set up a road block on the highway at the north city limits of Driggs. No tracks appeared in the fresh snow on the highway. They were looking for a station wagon and when such a vehicle came along the driver failed to heed the stop signal but speeded up and ran the road block. The deputy then shot at and hit the front tire of the station wagon which, after traveling about 440 feet further down the road, went out of control on the west side of the highway, ran into a cement culvert or abutment and came to a stop. The two officers cautiously approached the vehicle, a 1952 Pontiac station wagon, which had been out of their sight for a short time and distance after it had stopped. The deputy sheriff observed human footprints leaving the vehicle on its right hand side. They found a man pinned in by the front seat which had been pushed ahead by a load of seven slot machines from behind. This man was Donald Lee Fedder, who was injured. The two officers took him to the county jail, which consumed about twenty minutes.

When the officers and two others returned to the wrecked station wagon the deputy observed an additional set of human footprints crossing the road and approaching the car from the left hand side, and then going around the car to the right hand door. A brown coat, a cap and sweatshirt, which the officers had observed previously, were gone from the interior of the car. The officers attempted to follow the tracks for a time but gave up and set a road block.

During the day of December 29, 1952, the sheriff and other officers ascertained that five slot machines had been taken from the Tetonia Club, but nothing else therein had been disturbed. One Williams owned the club and its contents, including the five machines, and he and his assistants at the club identified those machines as five of the seven machines found in the station wagon. No one who had anything to do with the club, being the owner, the manager and the bartender had arranged any sale, transfer or other disposition of any of the club's slot machines. Only the manager and bartender had keys to the club. The bartender, when he cleaned the club during Sunday afternoon, December 28, 1952, saw the machines therein. The officers also ascertained that the front door key would not work in the front door lock and the padlock on the back door had been twisted off and broken; tracks led from the back door around to the highway; marks were found on the front door and the door casing, made by a hard instrument, in the general area of the lock, and metal in the door frame, a part of the lock, was sprung.

A search was conducted for the man who had left the station wagon by its right hand door, leaving tracks. Late in the day of December 29, 1952, a man, appellant herein, was apprehended in a sagebrush field about five and one-half miles south of Driggs. He had about $800 on his person.

The foregoing facts and circumstances are not in dispute.

Additional undisputed, as well as disputed, facts and circumstances, will now be reviewed in the light of appellant's assignment of error, that the evidence is insufficient to sustain the verdict of the jury, which appellant also urged in his motion for a new trial.

Appellant, testifying in his own behalf, stated that he was authorized by the federal government to deal in coin operated amusement devices, and had slot machine dealings with Fedder during the previous two and a half months; that with about $800 he left Boise with Fedder Sunday, December 28, 1952, about 3:30 to 4:00 o'clock P.M., driving his mother's 1952 Pontiac station wagon, to buy slot machines, arriving in Idaho Falls at about 9:30 that evening; then as appellant stated, Fedder met a man, whom appellant did not know, had not met and never did meet, and that Fedder and that man conversed out of hearing of appellant; then Fedder informed appellant that he,

appellant, was not to be in on "the transaction". Appellant then decided to drive to Driggs and visit one Markham, his brother-in-law's brother; the other man would go to Driggs in his own car, a 2-door gray Chevrolet.

Appellant testified that then he and Fedder drove to Driggs, arriving there about 11:30 P.M., December 28, 1952; that the other man, waiting in his Chevrolet in front of a cafe, drove his car, following appellant and Fedder in the station wagon; that appellant got out at the north end of the city of Driggs, which he stated was in the vicinity of the Markham house; then Fedder, stating he would be back in about an hour, drove the station wagon toward Tetonia, and the other man followed in the Chevrolet. Here the Chevrolet, if such there was, disappears from the record.

Appellant, further testifying, stated that he went to the Markham house and finding it dark, did not try to arouse any occupant therein. Here Markham disappears from the record. Appellant then sat down in a 1938 Plymouth nearby where he stayed until he heard shots, which time, according to the deputy sheriff, was 5:12 A.M., the following morning; and then appellant got out of the Plymouth car and observed a man approaching who acted like he was hurt and winded; that appellant called to him and recognized him as the man he had previously seen in Idaho Falls; that this man told appellant that he and Fedder had a wreck and Fedder was hurt; that there-upon appellant decided to leave the vicinity since he knew somebody would be following the tracks made by this other man; and that he, appellant, would be detained if found there, since twice previously he had been convicted and sentenced for burglary, once during 1934 in Ada County, and again during 1939 in Portland, Oregon. Then appellant, stating he did not know who the man was, nevertheless volunteered to "make a trail" for him and invited him to take appellant's place in the Plymouth car. Here the mysterious stranger and the Plymouth car, if such there were, disappear from the record.

Appellant stated that early morning aforesaid he was wearing a pair of dress trousers, a dress coat and no hat. He then ostensibly traced his movements up the highway to the station wagon, where he obtained his coveralls, brown coat and cap; his returning back to the vehicle after he had gone about a hundred yards, to get his sweatshirt and flashlight; his circling around in various directions, including going hand-over-hand along the top of a fence, thereby to throw officers off his tracks; his hiding in a barn and in a refrigerator crate therein during the daytime of December 29th, and his traveling afoot until apprehended during the evening of that day in the sagebrush field about five and one-half miles south of Driggs.

Appellant, upon being apprehended, admitted his remark to the sheriff, "My name is Johnson; I want to see my attorney and

how much is the bail." During his testimony appellant was asked why he went back to the wrecked automobile, to which he answered, "I went back to get my coat, it was cold." When appellant was being transported to Driggs, after being apprehended, a witness remarked to him, "A fine buddy you are, running off and leaving your buddy in the car," to which remark appellant made answer according to three witnesses, "I couldn't get him out, he claimed his leg was broken," and appellant admitted, "I might have" made such statement. When asked what he thought the lady would think about the wrecking of the car, appellant admitted it looked pretty bad to him the last time he saw it.

The coveralls which appellant wore when apprehended were identified by Mr. and Mrs. Berry as looking like or similar to the coveralls worn by one of the men, observed by them, taking slot machines from the Tetonia Club the early morning of December 29, 1952.

The deputy sheriff placed appellant's described location of the Plymouth car, as about three blocks from the place where the Pontiac station wagon came to a stop. Appellant asserts that the deputy found the Plymouth car at the place as appellant had described it to be; but the record shows only, that the deputy placed the locality, but not the car, as appellant had described such locality.

The 1952 Ada County registration certificate of the Pontiac station wagon, in which was shown its Ada County license number, was found in the vehicle showing its registration to be in the name of "Emma Malone" (with "F. J." following the name), who, appellant stated, is his mother. In the same envelope containing the station wagon's certificate of registration, was found the Ada County registration certificate of appellant's trailer.

The Pontiac station wagon when apprehended had on it Fremont County license plates, which the parties stipulated were stolen at Teton City December 27 or the morning of December 28, 1952. Nothing appears in the record relating to the license plates belonging to the station wagon, nor when or where appellant last drove that vehicle with its lawful license plates attached.

Appellant advanced the alibi that he could not have been in Teton City at either of the times stipulated when the Fremont County license plates were stolen at Teton City because he had not as yet left Boise. He attempted to prove such alibi by proof of a $5.00 check dated December 28, 1952, made payable to cash (Def. Exhibit No. 2) which the maker testified she paid to appellant the afternoon of that date, supported by the testimony of appellant's wife.

Appellant criticizes respondent for introducing certain evidence, claiming unwarranted inferences may be drawn therefrom. He points to the vice-grips (State's Exhibit No. "O") and the broken padlock (State's Exhibit No. "N"); also the pieces of wood,

one from the front door and the other from the front door casing of the Tetonia Club showing the marks or indentations impressed into the wood (State's Exhibits Nos. "H" and "I"), and the two certain tools taken from under the front seat of the station wagon (State's Exhibits Nos. "M" and "N"). Respondent introduced such exhibits in evidence by the testimony of identifying witnesses, without further explanation.

Appellant's counsel then chose to develop whether or not the vice-grips had anything to do with breaking the padlock, in that he led the sheriff into expressing his opinion that they did; and at such counsel's request that such officer show marks on the broken padlock, "that a pair of vice-grips is going to make," the sheriff pointed out two marks thereon; also led the sheriff on to state, "We entered the lock and vice-grips in evidence, * * * because they had been forcibly broken, the lock had been forcibly broken;" then appellant's counsel attempted to develop that the F.B.I. couldn't reach a definite conclusion in the premises, although he did not offer evidence to substantiate such a conclusion.

Appellant's counsel then turned to the pieces of wood from the front door and door casing of the Tetonia Club and the two tools which respondent had introduced in evidence (State's Exhibits Nos. "H", "I", "M" and "O"). He again attempted to develop that the F.B.I. were not prepared to give any answer as to the two tools and the marks in the pieces of wood, but again did not offer substantiating evidence in the premises.

State's Exhibits Nos. "H", "I", "M", "N", "O" and "P" were properly introduced in evidence. There was sufficient connection between the exhibits, the burglary and the possession of the tools (State's Exhibits Nos. "M", "N", and "O") to admit the same in evidence, inasmuch as the tools themselves so admitted were capable of making the entry and their admission was not error. State v. Kleier, 69 Idaho 278, 206 P.2d 513.

Appellant points out wherein the sheriff's testimony on direct examination differed in some respects with that elicited from him on cross-examination with reference to his observance of the tracks leading to and from the station wagon and when he saw appellant's articles of clothing in the vehicle; also, that it is impossible to ascertain definite facts concerning the tracks from the sheriff's testimony; and asserts that the conflict in the evidence is by reason of conflict in the testimony of respondent's witnesses.

Now with reference to the tracks leading to and from the station wagon and appellant's clothing therein, the deputy sheriff, the sheriff and appellant himself testified with reference thereto; and particularly, appellant by his own testimony admitted that he made the tracks and that the clothing which he took from the vehicle belonged to him. Under such circumstances the

discrepencies in the sheriff's testimony, to which appellant refers, become immaterial. Moreover, the record is replete with appellant's evasive and contradictory testimony; particularly illustrative are some of the statements he evasively admits he made *upon being apprehended*; his evasive, and in instances, contradictory explanations relating to his clothing, his tracks, his whereabouts up to a short time after the stopping of the station wagon, and relating to the claimed mysterious third person, whom appellant never had met and didn't know.

Appellant points to the improbability of his remaining uninjured had he been in the station wagon when it came to a stop. He points to its high speed of an estimated 80 miles per hour as it ran the road block and coming to a sudden stop against a cement abutment or culvert, with considerable resultant damage to the vehicle; but he omits from his argument the fact that the station wagon came to a stop, after traversing an additional 440 feet.

 It is within the province of the jury to believe or disbelieve the testimony of any witness, or any portion of such testimony, since the jury are the exclusive judges of his credibility. I.C., § 9–201; State v. Cacavas, 55 Idaho 538, 44 P.2d 1110, and authorities therein cited; State v. Hansen, 67 Idaho 359, 181 P.2d 192; State v. Davis, 69 Idaho 270, 206 P.2d 271.

 In a burglary prosecution it is sufficient to show unlawful intent when the entry was made, by circumstantial evidence. One's intent may be proved by his acts and conduct, and such is the usual and customary mode of proving intent. State v. Kleier, supra; Ex parte Seyfried, 74 Idaho 467, 264 P.2d 685.

 While the evidence is in conflict, there is sufficient substantial, competent evidence to sustain the verdict, and the question of fact was one exclusively for the jury. The jury having passed on the facts, there being substantial competent evidence to sustain the jury's verdict, the same will not be disturbed on appeal. State v. Steen, 29 Idaho 337, 158 P. 499; State v. Hart, 40 Idaho 71, 231 P. 671; State v. Kleier, supra.

Appellant assigns error of the trial court in permitting the witness, Donald Lee Fedder, *to assert his constitutional privilege of refusing to testify, under Article I, § 13 of the Constitution of the State of Idaho and the Fifth Amendment of the Constitution of the United States, on the ground that his testimony may tend to incriminate him.*

Fedder was involved in the matters here under consideration as is shown by the record herein; shortly before, he had been tried and convicted of the crime of burglary of the first degree. His perfected appeal to *this court, from the judgment of conviction,* had not been disposed of as of the time of the trial of appellant.

 Appellant asserts that under such circumstances, *Fedder's testimony could not*

tend to incriminate him and that the constitutional privilege cannot attach. Fedder had not as yet been acquitted of the charge of first degree burglary, and no certainty attained that his conviction of the charge was final. The criminal action was still pending against him. His testimony or aspects thereof, if given as a witness at appellant's trial, might well react adversely and tend to incriminate him, should he be granted a new trial upon disposition of his pending appeal. Under the circumstances the trial court properly allowed Fedder to assert his constitutional immunity. 70 C.J. 727, sec. 880; 58 Am.Jur. 72, sec. 84.

Appellant's third and fourth assignments of error attack asserted conduct of respondent's special prosecutor as to certain remarks made during his argument to the jury. Nothing whatever appears in the transcript of the record of appellant's trial concerning any such remarks, or asserted conduct. Appellant refers to such alleged conduct in the affidavit of his counsel in support of the motion for a new trial; therein such counsel asserts that such prosecutor, in his opening argument, "confined his argument principally to castigating all the witnesses for the defendant as liars", and advised the jury "to the effect that if the attorney for the defendant believed that the defendant was innocent of the crime charged, he would have made application to the court for an advisory instruction to the jury to acquit the defendant."

█ Such affidavit does not purport to contain the exact language used by the special prosecutor; it only purports to give the substance of certain statements made by the prosecutor in the course of his argument, and such is too indefinite and uncertain for this court to consider in the light of reversible error. State v. Peck, 14 Idaho 712, 95 P. 515; State v. Gruber, 19 Idaho 692, 115 P. 1.

█ An assignment of error directed to the prosecutor's argument to the jury where the argument objected to is not preserved in the record, or any attempt made to have the portion of the argument objected to made a portion of the record, cannot be considered upon appeal. State v. Stevens, 119 Mont. 169, 172 P.2d 299; State v. Cooper, 114 Utah 531, 201 P.2d 764; State v. Berry, 170 Kan. 174, 223 P.2d 726; People v. Cayer, 102 Cal.App.2d 643, 228 P.2d 70; Kallnbach v. People, 125 Colo. 144, 242 P.2d 222; Kidd v. State, 97 Okl.Cr. 415, 266 P.2d 992.

Appellant, in his last assignment, asserts that all the elements of the crime of burglary were not proven in that no property rights exist in slot machines, which can only be used for gambling and lottery purposes, and have no value; that therefore there was failure to show an intent to steal personal property of another.

Appellant cites in support of his position, State v. Lymus, 26 Ohio St. 400, 20 Am. Rep. 772, which held that a dog was not included within the purview of Ohio's larceny statute; Culp v. State, 1 Port., Ala. 33, 26 Am.Dec. 357, which held that an allegation of larceny of a bill of credit, as a chose

in action, will not support an indictment on such a charge, if it appears that the bill of credit was of a character the issue of which was not authorized by an act of congress; and People v. Caridis, 29 Cal.App. 166, 154 P. 1061, wherein the California Court distinguished a lottery ticket evidencing an indebtedness, which could not be a subject matter of larceny, from the ticket considered as a piece of paper possessed perhaps of an intrinsic value, which value, however small, would suffice to make its wrongful taking petit larceny.

Appellant also cites State v. Village of Garden City, 74 Idaho 513, 265 P.2d 328, 335, a civil case, wherein this court ruled that slot machines are included within the purview of lotteries prohibited by Article III § 20 of the Constitution of the State of Idaho and Idaho Code Title 18, ch. 49; and appellant particularly points to the ruling therein, "There is no property right in the gambling devices [slot machines] herein described."

The court in the Garden City case ruled that no property rights exist in slot machines which can be sold by a public officer at public auction; also, that it is the use of the devices which violates the law; but the question, whether property of which the possession, sale, or use for certain purposes was unlawful, could be the subject matter of larceny, was not involved.

In People v. Odenwald, 104 Cal.App. 203, 285 P. 406, 286 P. 161, the accused, convicted of burglary, contended that the intoxicating liquor which they intended to steal after unlawful entry was possessed by the owner thereof contrary to both the federal and state laws and therefore not the subject of larceny. The National Prohibition Act, 27 U.S.C.A. § 39, made it unlawful to have or possess any liquor, or property designed for the manufacture of liquor, in violation of the act, and that "no property rights shall exist in any such liquor or property." The California appellate court made exhaustive research of the subject matter; its reasoning, in adversely answering the accuseds' contentions, is as follows:

"The authorities which hold that liquor so possessed cannot be the subject of burglary, * * * proceed upon the theory that, since one may not have a property right therein, the property itself cannot be stolen; that, inasmuch as it can have no legitimate or lawful value to its owner, *it is without inherent value.* We are not ready to accede to this reasoning. Regardless of its lawful or legitimate value, the appellants considered it of sufficient inherent value to make it the subject of larceny. * * *

"Focusing our attention upon the fiction that, because it has no legal value, it has no value at all, we must close our eyes to the fact that its illegal value (using that term solely for the purpose of distinction) is such as to arouse the lust of greed to create a new type of dangerous and vicious criminal,

the one designated in common parlance as the 'hijacker.' Can he steal and rob and pillage with impunity simply because the object of his search cannot be made the subject of lawful possession or sale? The question shocks our sense of stabilized society, for the protection of which laws denouncing burglary and like offenses have been adopted."

And see the reasoning in State v. Schoonover, 122 Wash. 562, 211 P. 756, 758:

"The state punishes the wrongful taking of personal property belonging to or in the possession of another because of the offense against the majesty of its laws, and because of the inherent wickedness and criminality of the act, as well as because of the wrong done to the individual whose property is taken. Stated in another way, the state punishes larceny because it is larceny, and, that the guilty may not escape, it will treat any form of personal property having actual value as having value for the purposes of larceny, notwithstanding it may be unlawful for the possessor to have it in possession."

A discussion of the question raised by appellant indicating the great weight of authority as being in opposition to the premises which he advances is set forth in 32 Am.Jur., 985, sec. 75; therein it is stated:

"A thing may be the subject of larceny although it is unlawful for any person having such a thing to sell or otherwise dispose of it, or to use it for certain purposes, and even though it is unlawfully possessed at the time of the taking because kept or used for illegal purposes or because possession thereof is expressly prohibited by law. The authorities are in substantial agreement that such facts do not affect the character of the article as property which may be the subject of larceny. Thus * * * *gambling paraphernalia, the possession of which is prohibited,* and intoxicating liquors, outlawed or made contraband by statute, are all property to an extent sufficient to satisfy the requisites for the subject of larceny. Moreover, the fact that the possessor of such an article has no enforceable property rights therein does not require a contrary rule. The article may be the subject of larceny notwithstanding express statutes to the effect that no property rights shall exist in such articles illegally possessed, since the purpose of such statutes is to limit the civil rights of the possessor, not the criminal liability of others." (Emphasis supplied).

See also Smith v. State, 187 Ind. 253, 118 N.E. 954, L.R.A.1918D, 688; Osborne v. State, 115 Tenn. 717, 92 S.W. 853 (rule recognized); Bryant v. State, 129 Tex.Cr. R. 438, 87 S.W.2d 722, wherein it was held that a slot machine, although it could not be legally possessed, nevertheless was the subject of robbery; 36 C.J., Larceny, § 41,

p. 747; 52 C.J.S., Larceny, § 19, page 813; Burgess v. State, 161 Md. 162, 155 A. 153, 75 A.L.R. 1471 and Annotation 75 A.L.R. 1479. People v. Spencer, 54 Cal.App. 54, 201 P. 130, contra, appears overruled by People v. Odenswald, 104 Cal.App. 203, 285 P. 406, 286 P. 161.

■ The value and kind of property which become the subject of larceny upon a burglarious entry, is immaterial. All that is necessary is that the entry be made with intent to commit larceny. I.C. § 18–1401; State v. Dwyer, 33 Idaho 224, 191 P. 203; Ex parte Seyfried, 74 Idaho 467, 264 P.2d 685.

The examination of the record as a whole, considered in the light of appellant's assignments, presents no reversible error. The judgment is affirmed.

TAYLOR, C. J., and KEETON, PORTER and ANDERSON, JJ., concur.

On Petition for Rehearing

KEETON, Justice.

In a petition for rehearing appellant contends that certain questions asked the witness Fedder, if answered, could not tend to incriminate the witness. Hence his refusal to answer and the failure of the court to order the witness to answer is error.

I have re-examined the contention and am of the opinion that it has merit. Without further elaboration, I think the petition for rehearing should be granted.