# ROY ROBERTS v. STATE.

No. A-10805.   March 10, 1948.
Rehearing Denied June 9, 1948.
(194 P. 2d 219.)

94

Kelly Brown and Phil K. Oldham, both of Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Chester Norman, County Atty., and W. J. Crump and Chal Wheeler, Asst. County Attys., all of Muskogee, for defendant in error.

BAREFOOT, P. J.   Defendant, Roy Roberts, was charged jointly with Turner Ruben Ellis and Floyd Kent Jarrard in the district court of Muskogee county, with the crime of rape in the first degree; was granted a severance, tried, convicted and sentenced to serve a term of 15 years in the penitentiary, and has appealed.

For reversal of this case, it is contended:

First: That the court erred in overruling the motion for new trial, for the reason that the state failed to prove venue, or that the crime was committed in Muskogee county.

Second: That the court erred in failing to declare a mistrial for the reason that the state attempted to prove bribery and failed to prove same.

Third: The defendant was prevented from having a fair and impartial trial.

We consider it necessary to give a short statement of the evidence to properly consider the above errors.

The defendant, with Turner Ruben Ellis and Floyd Kent Jarrard, were jointly charged with forcibly raping Sena Taylor in Muskogee county on February 7, 1946. Prosecutrix was 22 years of age.

The evidence of prosecutrix was that she was rooming at the home of Mrs. Eliza Brown, 217 South Seventh Street, in the city of Muskogee, and was working at the Santa Fe Grill. Her hours were from 11 p. m. until 2 a. m. On the morning of February 7, 1946, after completion of her work, about 2 a. m., she started walking to her home. She was walking alone when she was seized by three parties, whom she positively identified as the defendant and his codefendants. She testified:

"Q. Tell the jury what it was and what happened to you. A. Well, I started home at 2 o'clock and got down to the Bedouin Temple and a car was parked right next to the sidewalk, and I walked on past it and as soon as I got past it, a little past, some one took hold of me around my neck and I twisted around and these other two got hold of me—I tried to get loose from the one that held me around the neck, like this, and these other two took hold of me and put me in the car. Q. How did they take hold of you? A. One of them grabbed me around the arms here and they took me and picked me up and put me in. I don't know how. Q. You just know they got hold of you and put you in the car? A. Yes, sir. Q. Did you make any resistance? A. Yes ,sir, I tried to get away. Q. After you were put in the car, what was done then? A. Well, one of them sat on my lap and the other sat on the other side. * * * Q. Yes, after you turned south off of the highway which runs east and west? A. The car was turned around and stop-

ped and they taken part of my clothes off. Mr. Oldham: We object to that. Mr. Crump: I concede that should be stricken. Q. They stopped the car. All right, then what happened, what did they do to you? A. That night? Q. Yes. A. Well, I got loose from one of them. Two of them got out of the car and left me in the car with one. Q. Which one did they leave you in the car with? A. The Roberts boy. Q. What happened? A. And I finally got out of the car away from him and ran across the road and these other two grabbed me over there and they pulled me down and one sat on this arm and one on this one. Q. What did the other one do? A. He raped me. Q. You mean he had intercourse with you? A. Yes, sir. Q. Did you give your consent for him to do that? A. No, sir. Q. Was it against your will? A. It was, yes, sir. Q. You said something about scuffling around in the car, tell the jury how you got out? A. Well, I fought around and finally I got over to the driver's side—the other side didn't have any handle to get out of the car on that side, and I got over on the other side and got out. While I was in the car the light came on—accidentally turned the light on in the car, me and Roberts. Q. What about the lights? A. We was fighting in the car and he accidentally turned the light on some way in there and that is how I saw him and noticed him so I could identify him. Q. Then you can identify Roberts? A. Yes, sir. Q. Then you got out of the car, you stated? A. Yes, sir. Q. What did you start to do when you got out of the car? A. I started to run. Q. What happened? A. The other two grabbed me. Q. What did they do? A. They throwed me down on the ground and one sat on one arm and the other on the other. Q. Which one was it that threw you down? A. I don't know which one. * * * Q. You don't know which one? A. No, sir. Q. Then what happened as to the other two boys? A. Well, they all had intercourse with me. I don't know whether all of them had intercourse twice or not but I know they did more than once apiece. . Q. Now, when these other two had intercourse—when the second one had intercourse with you, what did the other two boys do? A. They were sitting on my arms, holding me. Q.

When the third one had intercourse with you, what was the other two boys doing? A. They were sitting on my arms in the same position."

During the scuffle she lost a "rat" which she wore in her hair, a scarf, and a button off her coat which was in the shape of an owl. The button and a pair of step-ins which were taken off of the prosecuting witness by the defendants, as she testified, were found at the scene on the day following the alleged attack. Prosecutrix was present with the officers when these articles were found, and identified them.

The prosecuting witness also testified that defendants brought her back to Muskogee in the automobile and that she told them where she lived, but was crying and they told her they were going to Tulsa, and put her out of the car about three blocks from her home, and she walked home, arriving there about 4 a. m. She immediately reported what had happened to her to Mrs. Ayers, who roomed across the hall. She then went to Mrs. Brown's rooms and reported to her what had happened. The court properly did not permit prosecutrix to testify to the conversation she had with Mrs. Ayers and Mrs. Brown, or what she told them, but only that she reported to them what had happened. Immediately after talking to Mrs. Ayers and Mrs. Brown, prosecutrix called the police station and reported the occurrence to them, and two officers were sent to her address. The officers took her to the hospital, and she was there examined by Dr. I. W. Rogers early that morning, and on Sunday, February 10th, she was examined by Dr. W. M. Wood.

Prosecutrix gave the officers a description of the defendants and the car. The fenders, running board and part of the hood were off the car, and the latch on the inside of the right-hand door was also broken. From

the description given the officers, the defendants were arrested, and two of them were in the car when arrested. This becomes immaterial, however, as all three of the defendants testified in this case, and admitted taking prosecutrix to the scene of the crime and having intercourse with her, but denied forcibly raping her.

The cross-examination of prosecutrix did not develop any material change from direct examination. She testified that she did not see the defendants at the Santa Fe Grill on the night in question, and did not talk with any of them, and did not have a date with any one of them when she left to go home, and that defendant did not accompany her from the Santa Fe Grill.

Dr. Rogers testified to the examination of prosecutrix early on the morning of the alleged attack, and said: "The interior side of her legs, her knees especially, were scratched and bruised." He also testified that he examined her and found "the hymen was torn," "it was bleeding." He testified that she was very nervous, and complained of pain.

Dr. Wood, who examined prosecutrix on February 10th, testified.

"The hymen was deeply lacerated and torn down into the tissue beneath the hymen. The vagina was bruised and inflamed. The external genital organs were inflamed and swollen and bruised and on both sides of her knees. The skin was very tender over her lower abdomen and over her flank and back. * * * It had the appearance of a virgin hymen, a small type. The lacerations were new. They were not old lacerations. They had only been there a few days, you could tell by looking at them."

Harvey Huggins, Aubrey Chambers, Houston Johnson and Fred Ryser, all police officers, testified to investigations made by them, the finding of certain art-

icles, the examination of the premises, the location thereof, and the arrest of the defendants. It is unnecessary to consider their evidence, only as to the location of the place where the attack occurred, to which reference will hereafter be made.

Mrs. William Ayers corroborated the evidence of the prosecutrix, as to her reporting to her upon her return to her home on the morning of February 7, 1946. She testified the prosecutrix was hysterical, and was "crying and shaking all over."

Mrs. Eliza Brown, with whom prosecutrix roomed, testified that sometime between midnight and daylight she came to her room and reported to her what had happened; and stated: "she was shaking and she was crying * * * her hair was all down and loose." Prosecutrix called the police from her room.

Defendant offered a number of witnesses who testified that they saw the three defendants at the Santa Fe Grill on the night of February 6th, and prior to 2 a. m., on the morning of the 7th. Several of them testified they saw prosecutrix talking to the defendant, and several testified they saw defendant Roberts leave the Grill accompanied by a girl. It is unnecessary to give in detail this testimony.

Defendant testified that he and the codefendants came to Muskogee together on the night of February 6, 1946. They went to the Santa Fe Grill; that they were in and out of there, and he made a date with prosecutrix to accompany her home when she left at 2 a. m. That he was 18 years of age, and married, and his wife was in California at the time of the alleged attack. He testified that his codefendants left the Santa Fe Grill and went to where the automobile was parked across the

street, and that he accompanied the prosecutrix when she left the Grill a little after 2 a.m., and they went to where the car was parked and the other two boys were in it. That he opened the door and prosecutrix got in the front seat with him, and the other two boys were in the back seat. That she got into the car voluntarily and no one forced her to do so. That he drove out to Okmulgee avenue and went seven or eight miles and then turned south and went a mile or two and then turned the car around and headed back north. That he and prosecutrix got out of the car, and the other two boys stayed in the back seat. That he had intercourse with prosecutrix, with her consent, and that no force or compulsion was used in any way, and that his two codefendants did not grab her or hold her, as she testified. That he took her "step-ins" off with her consent and help. As to the codefendants, he testified: "Q. Did the other boys, did they have intercourse with her? A. They was up there, I think perhaps they did." He testified that he was in the car at the time, and that she came back to the car voluntarily and got in the front seat and they took her back home. He testified that they did not put her out of the car before they arrived at her home; and that he at no time heard her scream or cry out.

The two codefendants, Turner Ruben Ellis and Floyd Kent Jarrard, both corroborated the testimony of the defendant. Both testified to having intercourse with prosecutrix with her consent, and that no force or violence was used either to get her in the automobile, or when they were in the country. The cross-examination of these witnesses was long, as they had made written statements which were somewhat in conflict with the statements they made at the trial. It is unnecessary to discuss this evidence, as the weight of all the evidence which was

conflicting was a question for the jury to decide. Le-Favour v. State, 77 Okla. Cr. 383, 142 P. 2d 132; Landon v. State, 82 Okla. Cr. 336, 166 P. 2d 781.

In cases of this character, the question often arises as to whether it is necessary to corroborate the evidence of the prosecutrix. This court has often announced the rule to be that where the evidence of prosecutrix is contradictory, uncertain, improbable, or she has been impeached, it is necessary, under the law, that her testimony be corroborated. Morris v. State, 9 Okla. Cr. 241, 131 P. 731; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246; Weston v. State, 77 Okla. Cr. 51, 138 P. 2d 553; Hamrick v. State, 85 Okla. Cr. 50, 184 P. 2d 807.

But this court has also held that one may be convicted upon the uncorroborated evidence of the prosecutrix where her testimony is not contradictory, uncertain or improbable, and she has not been impeached. Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083, 1094, and cases above cited.

Each case stands upon the facts of that individual case, subject to the rule that the court in this class of cases will closely scrutinize and examine the evidence of each individual case. Weston v. State, supra.

The exception to the general rule has often been applied where the prosecutrix is a child of young and tender years. Weston v. State, supra; Morris v. State, supra; Witt v. State, 29 Okla. Cr. 357, 233 P. 788.

A careful examination of the record in the instant case convinces us that the evidence of the prosecutrix is such that it was not necessary, under the law, that her testimony be corroborated. It is clear and concise,

and does not bear any suggestion that it is improbable or false, in view of all the evidence and circumstances presented. In addition to this fact, the record clearly shows that her testimony was amply corroborated. The testimony to which reference has heretofore been made demonstrates this fact.

The first assignment of error is that the state failed to prove the venue in this case.

It is true that no witness testified in exact words that the crime was committed in Muskogee county; but it has been well established by the decisions of this court that venue does not have to be proven beyond a reasonable doubt and that it may be shown by circumstances which establish the fact that the place of the assault upon a prosecutrix was within the county named. All of the officers who visited the place where the assault occurred testified that they went west from Muskogee seven miles, and about a mile and a half south. The defendant and his codefendants all testified to the same facts. They testified to leaving the Santa Fe Grill at 2 a. m., and that they drove seven miles west on highway 64, and then approximately a mile and a quarter south to the place where they turned the car around and headed north, and that this was the place where they said they had voluntary intercourse with the prosecutrix; and she testified this was the place where she was assaulted and raped. This evidence was sufficient for the court to find that the crime was committed in Muskogee county. Fannin v. State, 65 Okla. Cr. 444, 88 P. 2d 671.

Defendant's second assignment of error is based upon a question asked the prosecutrix. The record discloses the following:

"Q. Now, I was asked to ask you this, Miss Sena, has any one approached you with any offer to get you to, for a consideration of money, dismiss this case or cause it to be dismissed and not appear against these boys? Mr. Oldham: We object as incompetent, irrelevant and immaterial. Mr. Davis: And highly prejudicial and not in the presence of the defendant. Mr. Crump: It wouldn't have to be in his presence if it was done with his consent. It is not for prejudicial purposes. Then we would have a right to prove it. The Court: Objection sustained. The jury will not consider that in making up your decision on account of this question at this time. Now, Judge, I don't know what your intentions are. Of course, you have a right to prove that but as you stated just now,—under the present posture of affairs, I will sustain their objection. Mr. Crump: I am inclined to think your Honor is correct. Mr. Oldham: Comes now the defendant and moves the court to declare this case a mistrial for the reason that the statement was made by the court that he could prove that statement. The Court: That is not the statement of the court. I am repeating what Judge Crump said. That don't make a statement. Mr. Oldham: Let the jury understand. The Court: I was repeating what he said. Gentlemen, the statement I made just now wasn't my statement. I was just repeating what Judge Crump had stated, what he had a right to do. I wasn't making that as my statement, what he had a right to do. I was repeating what he said he had a right to do. Mr. Crump: That is all. The Court: That is all, I guess, young lady."

It was of course objectionable as counsel was not entitled to show that any person other than the defendant or someone acting as his agent or representative had so approached the witness. But the court having sustained an objection to the same, and instructed the jury not to consider it, we are of the opinion that defendant was not prejudiced to the extent that this case should be reversed for this error.

It is also urged that the court committed reversible error by reason of certain questions asked of the witness W. D. Welch, by the state. These questions had reference to whether or not the witness had seen or heard the father of defendant offer any consideration to the prosecutrix to "lay off this case." The only objection to this question was that they were attempting to impeach their own witness because he was asked:

"Q. Mr. Welch, did you tell Judge Crump in the county attorney's office this morning that Roy Roberts had told you to see the girl and get her to lay off in this case? A. No, sir, I didn't."

There was no exception taken to this question. The next question was: "Did you have any conversation with Mr. Wilson, did you go to Mr. Wilson and tell him how much money would be paid if Sena Taylor would dismiss this case?"

Objection was made to this question, and, "The Court: I am going to sustain the objection."

The same may be said of the question propounded to prosecutrix, that we do not think it is sufficient to reverse this case in view of the whole record. The same reasoning is applicable to the testimony of the witness A. N. Wilson.

It is next contended that defendant did not have a fair trial. We have carefully examined the record and we do not find anything that justifies this contention. The trial court was very fair in his rulings, and is to be commended for the consideration given both to the defendant and the state in the trial of this case. Outside of the questions above noted, and to which the court sustained objections, we find nothing in the record to indicate the defendant did not have a fair and impartial

trial. There was nothing in the conduct of the attorneys representing the state that would in any way deprive the defendant of his substantial rights. This case presented a question of fact where there was a conflict in the evidence, and under the law it was for the jury to determine where the truth lay. They saw and heard the witnesses and were in a better position than is an appellate court to pass upon this issue of fact.

It is next contended that the court erred in permitting witnesses Mrs. William Ayers and Mrs. Eliza Brown to testify as to the complaint of the prosecutrix that she had been assaulted. It is contended that this evidence was inadmissible, and was not a part of the res gestae. It occurred immediately after prosecutrix had returned to her room in Muskogee on the morning of the assault. It was the first opportunity she had to speak to any party other than defendant and his codefendants, after the assault upon her. In a somewhat recent case, where the facts were very similar to those in the instant case, this court fully discussed the law applicable in this class of cases, and fully discussed the question of res gestae. Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797, 806. We shall, therefore, not attempt to further discuss or quote the law in the case. The Coppage case was reversed for the reason that the court permitted the witness to testify to a conversation had with the prosecutrix after her return to her home on the night of the assault, in which the prosecutrix not only made complaint of the assault, but gave details of the facts surrounding same which were very detrimental and prejudicial to the defendant. And the conversation occurred while the witness was upstairs and prosecutrix was downstairs, and the witness did not see or observe prose-

cutrix at the time of the conversation. Evidently the trial court in the instant case was very familiar with the rule of law as fully discussed in the Coppage case, for here the witnesses Mrs. Ayers and Mrs. Brown were only permitted to testify that prosecutrix made complaint to them immediately upon her arrival at her room, and as to her physical appearance. The court carefully avoided permitting these witnesses to testify to any facts which occurred at the time of the assault or thereafter, as related to them by the prosecutrix. This was strict accord with the doctrine announced in the Coppage case. There it was said:

"As stated in 44 Am. Jur. p. 953, § 84:

" '* * * but the rule supported by the weight of authority is that the prosecutrix may testify merely to the fact of making a complaint and not as to the details. On the direct examination the usual practice is merely to ask whether she made complaint that such an outrage had been perpetrated upon her, and to receive in answer only a simple yes or no. And a person to whom complaint had been made by the victim of a rape, when placed on the witness stand, cannot be permitted to repeat all the details of the outrage as reported to the witness.'

"The author then gives as a reason for this rule:

" 'The reason of the rule admitting the fact that complaint was made, and excluding the complaint itself, is founded, aside from its being hearsay, by those courts which do not treat it as part of the res gestae, upon the danger of allowing a designing female to corroborate her testimony by statements made by herself to third persons, and the difficulty of disproving the principal fact by the accused. In applying this rule, it has been held that while the witness should not be permitted to detail the particulars of the complaint, enough may be given in evidence to show the nature of the complaint,

even though it involves to some extent the particulars thereof, and that the rule is not violated by evidence as to the time and place where the complaint was made, the circumstances under which it was made, the person to whom made, the condition of the victim when making the complaint, the conduct of the prosecutrix at the time she made complaint, and that she exhibited, if such was the fact, marks of violence and other like indications, as confirmatory to her testimony.' "

The rule has been very clearly stated in the case of State v. Fowler, 13 Idaho 317, 89 P. 757, where the court said:

"In a prosecution for rape, the state may prove by the prosecutrix and other witnesses that she made complaint soon after the commission of the alleged act, and show when, where, and to whom, and under what circumstances she made complaint, and her appearance, demeanor, and physical condition at the time she made complaint; but the details of the conversations * * * may not be given by the witness."

See also Taylor v. State, 61 Okla. Cr. 110, 65 P. 2d 1233; Bouie v. State, 9 Okla. Cr. 345, 131 P. 953; Chastain v. State, 46 Okla. Cr. 123, 287 P. 826; State v. Hunter, 18 Wash. 670, 52 P. 247; People v. Scalamiero, 143 Cal. 343, 76 P. 1098; State v. Hoskinson, 78 Kan. 183, 96 P. 138; Dickens v. People, 60 Colo. 141, 152 P. 909.

For the reasons above stated, we are of the opinion that the court did not err in admitting the evidence of Mrs. Ayers and Mrs. Brown.

We have carefully examined the evidence of Dr. W. M. Wood, who examined the prosecutrix on Sunday following the assault on Thursday morning. We find nothing in this evidence which was of such prejudicial

108

nature as to require a reversal of this case, in view of the whole record.

The same rule applies to the evidence of Mrs. Iris Richardson, the manager of the Santa Fe Grill.

We have also considered the testimony of the witnesses Aubrey Chambers and Fred Ryser, officers, who found a bloody handkerchief and "rubbers" in the car driven by the defendants on the night of the assault. There was nothing prejudicial in this evidence. One of the codefendants testified that he used a "rubber" when having intercourse with the prosecutrix.

It is regrettable that a young man who had so recently been discharged from the service of his country should be called before the bar of justice to answer for a crime such as that with which the defendant here stands charged. A jury of his own home county gave him the minimum sentence provided by law. We are powerless to reduce the sentence, where this state of facts exists.

Finding no error in the record, the judgment of the district court of Muskogee county is affirmed.

JONES and BRETT, JJ., concur.