# KIDD et al. v. STATE.

No. A-11776. Dec. 30, 1953.

Rehearing Denied Jan. 20, 1954.

(266 P. 2d 992.)

416

Harold S. McArthur, Tulsa, H. Tom Kight, Jr., and Ralph B. Brainard, Claremore, for plaintiffs in error.

Dennis Bushyhead, Claremore, Hickman & Hickman, Tulsa, of counsel.

Mac Q. Williamson, Atty. Gen., and Owen J. Watts, Asst. Atty. Gen., for defendant in error.

POWELL, P. J. This case involves an appeal by A. J. Kidd and George (Pat) Goff from a conviction in the district court of Rogers county, where the jury found each of them guilty of rape in the first degree. It was alleged in the information that "while acting conjointly and together * * * they did make an

assault upon one Nadine Huckleberry * * * by means of force and violence overcoming her resistance, each rape, ravish and carnally know her * *." The court, by reason of the jury being unable to agree upon the amount of penalty fixed the punishment of each defendaint at 25 years in the State Penitentiary.

For reversal the eleven assignments of error set out in petition in error are argued under two main heads in brief filed in this court.

It is first stated that:

It is the contention of the defendants that the evidence of the State is in-sufficient to sustain a conviction of first degree rape as charged in the information and that an application of the rule of this State as determined by this court to the evidence in this case clearly reveals that the action should be reversed with directions to the trial court to dismiss the same."

Under this heading counsel state:

"It is obvious from the opening statement of the county attorney to the close of the testimony of the State that the conduct and actions of the prosecut-ing witness, Nadine Huckleberry, was not that of an outraged female and that she did not mention rape until taken to task by her mother for her late return from work on the evening in question."

Before summarizing the evidence the statutory provision, Tit. 21 O.S. 1951 § 1114, and some of the cases construing the same should be kept in mind. The statute reads:

"Rape committed by a male over eighteen years of age upon a female under the age of fourteen years, or incapable through lunacy or unsoundness of mind of giving legal consent; or accomplished with any female by means of force overcoming her resistance, or by means of threats of immediate and great bodily harm, accompanied by apparent power of execution, preventing such resistance, is rape in the first degree. In all other cases rape is of the second degree."

See, also, Tit. 21 O.S. 1951 § 1111, defining rape under varying circumstances.

In the case of Bulls v. State, 33 Okla. Cr. 64, 241 P. 605, this court, through Judge Doyle, said:

"To support charge of rape, female's resistance need only be such as to make nonconsent and actual resistance reasonably manifest, having regard for her age, strength, and surrounding circumstances."

In the body of the opinion, it was further stated:

"The old rule of 'resistance to the uttermost' is obsolete, and is repudiated by the more modern authorities. The law does not require that the woman shall do more than her strength, the surrounding facts, and all attending circumstances make it reasonable for her to do in order to manifest her opposition."

The above principles have been approved in a number of later cases demon-strating the application of the rule. See Harris v. State, 88 Okla. Cr. 413, 204 P. 2d 310; Jackson v. State, 77 Okla. Cr. 160, 140 P. 2d 606; Roberts v. State, 87 Okla. Cr. 93, 194 P. 2d 219; and Epley v. State, 94 Okla. Cr. 308, 235 P. 2d 711.

In the Epley case this court said:

"To establish rape by force it is not necessary to show that prosecutrix resisted to uttermost, but it is only required that she made reasonable resis-tance under all the circumstances, and that resistance was genuine, active, in good faith."

To be kept in mind, also, is the rule stated in Gullatt v. State, 80 Okla. Cr. 208, 158 P. 2d 353, 354, cited and urged by defendants, and reading:

"While it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, yet, it is equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment."

At this point it should be noted that an opinion was heretofore promulgated in this case under date of September 2, 1953; that a rehearing was sought and granted, and it may be said, principally for the reason that reference was made to and certain quotations were set out from evidence which were by the court stricken from the consideration of the jury. Counsel in one of their briefs on rehearing state:

"We submit that the record in this case stripped as it is by action of the trial court of all evidence of threats, is devoid of proof of force overcoming her resistance."

If the stricken evidence leaves the remaining evidence insufficient to support the charge, of course, the contention of appellants would have to be sustained, and would require a new trial. And it is true, as contended by counsel, that the stricken evidence, even though in case erroneously stricken by the trial court (which counsel do not admit), cannot now be considered by this court on appeal in determining the issues any more than it could have been considered by the jury. As called to our attention by appellants, this principle was involved in the case of Alford v. United States, 41 F. 2d 157, decided by the Circuit Court of Appeals for the Ninth Circuit, and there the court in the first paragraph of the syllabus stated:

"In criminal case, evidence which was stricken cannot be considered, even though clearly admissible."

See, also, People v. Canadian Fur Trappers' Corp., 248 N.Y. 159, 161 N.E. 455, 59 A.L.R. 372. We so hold. But at the same time we shall quote the stricken evidence for special purposes, indicating such as was stricken, which it will be seen was so intermingled with the evidence admitted as to justify quotation (if the evidence left should be determined as sufficient to support the charge), as to whether or not such stricken evidence might account for the punishment fixed by the court, the jury not having been able to agree upon the same, and the punishment appearing excessive in view of the weakness of the proof when shorn of the stricken evidence.

There are two other reasons why the stricken evidence must be considered for special purposes, and being, first, that even though the proof should be held sufficient to support the charge, omitting from consideration the stricken testimony, still, if the testimony was erroneously stricken, and even though under such circumstances it could not play any part in determining the sufficiency of the proof to support the charge, this court would not want to inferentially lend its stamp of approval to the action of the trial court in such respect. And, second, should the admitted evidence be found insufficient to support the charge and a new trial be granted, then it would be most important to determine whether or not the action of the trial court was correct or incorrect, so that if there was error, it might not be repeated.

So we proceed with consideration of the evidence. The defendants offered no testimony, so that the case stands or falls upon the admitted evidence presented by the state.

The record discloses that the case was first filed in Tulsa county, but on preliminary hearing in that county it developed that the location of the spot identified by the prosecutrix as where the acts of sexual intercourse took place

was some 1,568 feet north of the Rogers-Tulsa county line, and in Rogers county, on a road known as Lynn Lane. The case was thereupon dismissed and refiled in Rogers county, a second preliminary was had, and the defendants bound over to the district court, and the case came on for trial on November 16, 1951, and was completed on November 17, 1951.

Nadine Huckleberry, the prosecutrix, testified that she was 18 years of age; that she lived with her mother, a sister and step-father in a three-room house in Tulsa, she and the sister sleeping in a combination bedroom-living room, and her mother and stepfather in the one regular bedroom. There was a kitchen, but apparently no bathroom. She had lived in Tulsa since 1943, and was working as a janitress at the Oil Capitol Building, going to work at 4:30 in the afternoon, and working until 11:30 at night. Two nights prior to August 3 the defendant George (Pat) Goff and a boy by the name of Donnie Shaw had called for Nadine as she got off from work, and had taken her home in their car. On the night of August 3, at 11:30 o'clock, the defendant George (Pat) Goff had again met her as she left her work and asked if he could take her home, and she had consented. She stated that she had known Goff, who was a boy of about 19 years of age, for about three years, and had confidence in him. Goff escorted witness about a half block to where his car was parked, and Goff then introduced Nadine to a man who was sitting in the car, the defendant A. J. Kidd, a person shown to have been nearly twice the age of Goff or Nadine, or 33 years of age. She stated that it was raining and in that she had known Goff and trusted him, she accepted his invitation. She wanted to sit on the outside but, Goff insisted that all sit in the front seat with her in the middle. Prosecutrix advised Goff that she expected him to pick up the lady who had ridden with them previously when he drove her home, but he stated, "No, we will take A. J. Kidd home first"; that he lived out by the Circle. She said that the lady worked at the National Bank Building, and Goff was to pick this lady up after A. J. Kidd reached his home.

They drove east on Eleventh Street past the KVOO tower and later stopped at a drive-in, where Kidd got out and purchased three bottles of beer and offered one to her, and she advised him that she did not drink. Her home was west of the drive-in, and she again asked the men about taking her home first, and they told her that Kidd was to be taken home first as he only lived about three-fourths of a mile away, and thereafter Goff would drive her home. Nadine had refused to drink any beer, so when the defendants drank the beer, A. J. Kidd drove the car about a mile and a half down a dirt road, where there were trees and no houses. She testified that she had become suspicious and had remonstrated about the drive, telling the defendants that her mother would be worried if she got home late. At this point Goff told Kidd to stop the car as he wanted to go to the bathroom, and the car was stopped and both defendants got out, leaving Nadine Huckleberry sitting in the front seat.

Prosecutrix further testified as follows:

"Q. All right, now after these two young men got out, then what happened? A. Well, they came back in just a few minutes and Pat Goff said, 'I'm going to get in your panties', *and I begged and I pleaded and he just said, 'Get in the back seat', so when I started to get out of the front seat I tried to make a run and he held me and he said, 'If you don't get back there I'm going to throw you on the ground and take it on the ground'.* (Emphasis supplied.) Q. Now, did you get in the back seat of the car? A. Yes, sir, he pushed me. Q. Were there any houses around close or lights that you could see? A. No, sir. Q. All right, now tell the jury what happened after you got in the back seat of the car. A. *Well, Pat Goff pushed me down and he jerked off my half-slip, and he thought it was my panties and then he unbuttoned his trousers and placed his private parts in mine, sir.* (Emphasis supplied.) Q. Now, did you consent to this or did you

resist? A. No, sir. Q. Now, what did you do in the way of resistance? A. *I just begged and pleaded. I didn't know much I could do. I was afraid they was going to kill me.* (Emphasis supplied.) Q. Did anybody threaten to kill you? A. Yes, sir, A. J. Kidd did. By Mr. McArthur: We object to that as being incompetent, irrelevant and immaterial and move that it be stricken because it is not alleged in the petition. By the Court: Yes, the answer will be stricken and the jury admonished not to consider it. Q. What did A. J. Kidd say? A. He told me if I didn't shut up he was going to kill me with that beer bottle. By Mr. McArthur: We object to that and ask that it be stricken for the same reason. By the Court: Yes, sustained. By Mr. Daugherty: Your honor, I pleaded that. By the Court: Well, read it there, Mr. County Attorney. Mr. Daugherty: (reading) Did willfully, knowingly, wrongfully, unlawfully, forcibly, violently and feloniously * * * By the Court: All right, read on. [Mr. Daugherty then completed reading the information]. By Mr. McArthur: No, it does not, your Honor. By the Court: Yes, it will be sustained and the jury admonished not to consider it. Q. (By Mr. Daugherty) Tell the jury what you did to resist or to prevent or to keep George (Pat) Goff from having sexual intercourse with you? A. Well, sir, I just begged and I pleaded. I was afraid I was going to get killed. I didn't know much I could do. By Mr. Kight: Your Honor, we object to that as a voluntary statement about where she said she was afraid she was going to get killed. And it calls for a conclusion, and not responsive. It's certainly not responsive to the question. By the Court: Yes, the answer will be stricken and the jury admonished not to consider it. It's not responsive. Q. What else did you do, Nadine? A. *Well, I didn't want to lay down and Pat pushed me, kept forcing me to lay down.* (Emphasis supplied.) By Mr. McArthur: We ask that be stricken as a conclusion. Mr. Daugherty: Tell what he did? By the Court: Well, overruled. Mr. McArthur: Exception. Q. (Mr. Daugherty) I will ask you whether or not when Pat Goff finally inserted his private parts into your private parts, whether or not it hurt you? A. Yes, sir, it did. It was very painful and I told him, and he told me to shut up. By Mr. Kight: We object to any voluntary statements by the witness. She answers the question and then she follows up. By the Court: Yes, this is necessary that this be conducted on a question and answer basis and you just answer the question and don't anticipate the next question because they have a right to object to it and you shouldn't answer it until the Court rules and don't make any voluntary statements. Just answer the question of the counsel, and that's the way it should be conducted. The answer will be stricken and the jury—read the question, Mr. Reporter. (Question read by the reporter.) Q. (Mr. Daugherty) Just answer yes or no. A. Yes, sir, it was. Q. You mean it did? A. Yes, sir. Q. Now, after this begun to pain you, what did you do or say? A. I told Pat Goff it hurt and he told me to lay still. Q. How long would you say, from your judgment, that from the time that you were in the back seat of the car until this act was fully accomplished? A. I can't really say, sir. Q. After Pat Goff accomplished this act, then what was the next thing happened? A. Well, he got out of the car and went around the back, and A. J. Kidd come in and I had sat up and he told me to lay down, that he wasn't gonna hurt me and he told me not to tell Pat Goff, and he had a sexual intercourse too. Q. Did you object to him? A. *As well as I could, sir."* (Emphasis supplied.)

The testimony of witness further showed that A. J. Kidd was not driven to his home first, but the defendants drove Nadine home, arriving about 1:20 a.m. She entered her home by the back door, after awakening her step-father, who was sleeping in that room. She got clean underclothing from a chest of drawers and went to the kitchen, washed her panties, and hung them out to dry on the clothes line in the back yard, which she entered from the kitchen. She then came back to her room and her sister and her mother were sleeping in her bed, and she began to open up a folding bed, and her mother awoke and asked her about coming in late and she then told her mother what happened to her. Her mother and stepfather immediately went to a neighbor's house and 'phoned the police headquarters and two officers came out and heard her statement, and then took her to the police station, where she was examined by Dr. Beddoe. Witness swore that she had never had intercourse before.

At the time of the trial Dr. Beddoe had moved to a distant state and it was agreed that his testimony given at the preliminary hearing might be read in evidence. He testified as follows:

"Q. State your name. A. Doctor Harold Beddoe. Q. Where do you live? A. Tulsa, Oklahoma. Q. What is your position or profession? A. Physician for the police department for the city of Tulsa. Q. You are a regular licensed and practicing physician? A. Yes, sir. (By Mr. McArthur: We admit his qualifications) Q. Doctor, did you have occasion on the night of the third or morning of the fourth to visit Nadine Huckleberry? A. Yes, sir, I did. Q. What was that? A. I was called to my office by the police department to examine this girl on the 4th of August. A. For what purpose? A. To determine whether or not a vaginal penetration had occurred. Q. Did you make the examination? A. Yes, sir, I did. The hymen was torn on either side and from the edges the blood still oozed and from the vagina a smear was made. Microscopic examination showed spermatozoa. Q. From your examination, what is your opinion as to the cause of this condition? A. Accomplished vagina penetration and intercourse presumably had occurred. Q. Formed the opinion that had occurred recently? A. Yes, sir. Q. What period of time? A. Best I could state it might have been a few hours prior to the time I made the examination, certainly not more than six hours. Q. What would be your opinion from this examination as to this girl's status, whether she was a virgin girl previous to the time this occurred? A. My opinion would be that penetration had not occurred before that evening. Q. You say in your opinion that had been caused by force? A. Yes, from force on the hymen in sexual intercourse. Force must be used in accomplishing penetration. Q. From your examination there was not more force used than in ordinary cases? A. No, sir, I couldn't say. Q. No marks of force? A. No, sir, not that I found. Q. Not distressed in any way? A. Well, I would say she was somewhat distressed, yes. Q. She wasn't hysterical? A. She was concerned. Q. These tears you speak of were what length? A. Approximately one-fourth of an inch. Q. Small tears? A. Well, the hymen varies in different individuals approximately a fourth of an inch or three-eighths in the average width on either side. Q. What is the ordinary size of such organ would you say in such circumstances in the average married woman? A. Ordinarily more than two, two ordinarily used. Q. Was the girl hysterical? A. No, sir. Q. Under mental distress? A. Well, I wouldn't give my opinion on that, I don't know. Q. You didn't observe her on the witness stand? A. No, sir."

Counsel for defendants point out statements made by the prosecution witness on preliminary hearing asserted to be at variance with statements made at trial, and which the court permitted to be read to the jury, as follows:

(Cross-examination by Mr. McArthur):

"Q. You were afraid she would get on you for being so late? A. Yes. Q. That is why you told her? A. Yes. * * * Q. As a matter of fact, if your mother hadn't woke up, you wouldn't have told anybody about it, would you? That is correct, isn't it? A. I was going up and tell my neighbor. Q. Tell your neighbor? A. Yes I was, sir. Q. When? A. I was going to wait until morning to tell her, because I didn't want to wake her up."

Dr. Beddoe had testified both at the first preliminary hearing in Tulsa, and at the hearing in Rogers county. By reason of his absence at trial, the court permitted the defense, on agreement of the state, to read his testimony given at the first preliminary hearing for the purpose of showing to the jury any difference. The testimony given at the first preliminary covering the vaginal examination was if anything stronger for the state, but while he stated at the second preliminary that whereas the girl Nadine was not hysterical when he examined her some two or three hours after the intercourse, that she was "concerned". He had previously expressed the thought this way:

"Q. What was the girl's mental attitude, and physical attitude, if any? A. She seemed not in any way hysterical. She was not hysterical or unduly upset when I examined her. Q. She was not hysterical or upset at all? A. No."

The mother of the prosecutrix testified that at about 1:25 a.m. on the night [morning] of August 4, 1951, she was awakened by her daughter Nadine standing by the foot of her bed and that "she was very upset". She stated that the girl told her about being raped by two men, naming them. and that she and her husband went to the next door neighbor about a block away and called the police, and after Nadine gave them her statement that they went to the police headquarters where Nadine was examined by Dr. Beddoe, the police physician.

Mrs. Beulah Johnson, Tulsa policewoman, testified to having a conversation with the defendants after their arrest, and prior to charges being filed against them; that she had previously questioned Nadine Huckleberry concerning her charges that she had been raped by the defendants; that she advised the defendants that they did not have to give any statement, if they did not want to; and were entitled to be represented by a lawyer; that she first talked with Goff and he advised her that he had already retained a lawyer. Witness further testified:

"A. I asked him if he knew Nadine Huckleberry and he said he did, and I asked him how long he had known her and he said several years. I also asked him if on Tuesday night of that week he and a boy by the name of Donnie Shaw had met her when she got off work and had taken her home and he replied that he did. Then I asked him if he had met her on Friday night, and he said yes. I asked him about what time, and he said about 11:30. I asked him who was with him, and he said A. J. Kidd, was in A. J. Kidd's car. I asked him if they had taken her home that night, and he said yes, and what time they arrived at home, and he said some time after 1 o'clock, and I asked him what happened 'between 11:30 and this time he arrived home, and he refused, he said he didn't want to talk about it, he didn't want to answer any questions about what happened between the time he met her and took her home. Q. Were any further statements made by him in your presence?? A. That's about all."

Witness further stated that on the same day, which was August 6, that she questioned A. J. Kidd, and stated that he made the following statement:

"A. He said he didn't blame the officers for investigating the case but that he didn't see why he was in jail, he didn't have anything to do with it. I asked him if he knew Nadine Huckleberry and he said he did not know her, he wouldn't know her if she walked in the door at that present time, never heard of her. I asked him if he was out with Pat Goff on Friday night, or the preceding Friday night, and he said 'no', that he was at home in bed, that he had loaned his car to a man by the name of Leon Smith, and that he was at home in bed, that he didn't even drive his car that night. Q. Did he make any other statements to you? A. Yes, he said he had taken Pat Goff down to see a lawyer, that he wanted to see a good lawyer, and the had taken him down to Mr. McArthur's house on Saturday morning and told him he wanted a lawyer. Q. Any other statements he made? A. Yes, sir. Q. What were they? A. Mr. McArthur had told them to lay low until Monday morning so they wouldn't have to spend the whole week-end in jail. Q. Now were there any other statements? A. That's about all."

Officers Ray and Leavell testified but their testimony added nothing except that of Leavell, which fixed the scene of the offense charged as in Rogers county.

Thus the evidence ended. Applying the provisions of the applicable statute, Tit. 21 .OS. 1951, § 1114, heretofore quoted, and § 1111 referred to, and the principles of law heretofore set out from previous cases similar to this one that we are now considering, was there sufficient evidence to support the verdict of the jury, and the judgment entered?

There is no question but that this young girl was the victim of sexual penetration, but that defendants contend that the evidence was insufficient to show that the acts proven were not done with the consent of the prosecutrix, in that she had no bruises on her body and admitted that the defendants did not strike her, and by reason of her failure to scream, and failure to rush into her home in a hysterical outcry, and that she offered doubtful resistance, which in the absence of threats of immediate and great bodily harm, accompanied by apparent power of execution, prevented such resistance.

The evidence is uncontradicted but that she was a virgin that night in August, 1951, when her trusted acquaintance, George (Pat) Goff, awaited this 18 year old girl as she completed her menial duties of scrubbing and cleaning an office building, and emerged into the rain and was offered transportation to her home, and the circumstances that required her to ride with the older defendant, Kidd were strictly chargeable to Goff, and every act thereafter in the process of taking her home was conceived by the defendants, and she had no say in accepting or rejecting. These facts have a most important bearing in evaluating the incidents at the secluded spot. And finally they by trickery reached the secluded and wooded spot, and Goff, her trusted friend, announced to her in blunt language what his intentions were, and she jumped out of the car in panic and did the best she could to get away and save her virtue, about the only asset this under-priviliged girl was shown to have possessed. Is it not reasonable that she did just as she stated, and jumped out of the car to run away? But the defendant Goff grabbed her and she "begged and pleaded", but he said, "If you don't get back in there I'm going to throw you on the ground and take it on the ground." This left no doubt as to his intentions, and the force to be used. Lust was rampant. She said, "He pushed me down and jerked off my half-slip." She said, "I was afraid they were going to kill me." It will be noted from the quoted testimony that no objection was interposed to this statement by the prosecutrix, though the action by one of the defendants indicated how he would kill her was stricken and cannot be considered for the reasons stated. She said, "Pat pushed me and kept forcing me to lay down." Also Kidd at this time was standing outside the car. Yet the defense would interpret all this as acquiescence. They would have us believe that this inexperienced girl was as calloused as a harlot and though this was her first experience, interposed doubtful resistance even with a third party looking on. Such thought is repugnant to nature. Goff accomplished his purpose, and then got out of the car and Kidd took his turn. But it is contended this did not show sufficient resistance. They would have the girl "resist to the utmost" which would amount to resisting to the death when attacked by one or more lustful males bent on satisfying vicious appetites where the circumstances were also too indicative of prior planning that had built them up to any extreme in accomplishing their purpose. By the time A. J. Kidd took over this victim was whipped down and demoralized. Before she could get out of the car Goff stepped away and Kidd got in. When asked if she objected to A. J. Kidd, this girl stated: "As well as I could, sir." She was not questioned on cross-examination as to just what she did, and meant by this statement. No evidence was introduced to show that she did not do just what she said, which implies that her resistance was overcome by superior force. So that we must accept her statement as meaning just what the words import and the circumstances imply, in the absence of evidence in contradiction. For here the question is whether or not the evidence was sufficient to withstand the demurrer. There is not involved the problem of weighing the evidence, where there would be contradiction. This court would not weigh the evidence.

It is further claimed that because the girl was not hysterical when she reached home that the defendants should be told in effect to go hence and sin

no more. We are in effect asked to not give any weight to the fact that there is no evidence of enticement or other conduct on the part of the victim which could have contributed to the conduct of her ravishers.

The nature of different individuals varies. Here was a girl forced at a tender age to make her own living and live in a hovel, when compared to average standards. She was apparently more or less stoical, but her mother said that when she was awakened by Nadine that the girl was standing by her bed "and very much upset." Dr. Beddoe, who examined her a couple of hours or so later, said that she was "concerned" but not hysterical.

What good would it have done for the victim to have screamed in the secluded spot where the acts occurred? She was in fear that to scream might cause her to forfeit her life. She had good reason by the fact of the almost daily account of the number of females who met their deaths while resisting to the utmost when resistance was useless. From the recited conduct and actions of the defendants, acting together in the nighttime and in a secluded spot, opposing one helpless girl, could there be any doubt but that she was telling the truth when she said: "I was afraid they were going to kill me"? Did she not have good reason to so conclude? Having reasonably from the entire circumstances arrived at such conclusion, under the authorities already recited, this girl was not required to thereafter risk in addition to her virginity, the forfeiture of her life. The force used in overcoming the resistance offered by this virgin girl, under the facts in this case, was sufficient to constitute rape. Her statement summarizing the situation as she viewed it at the time was admitted without objection. The fact that one may be an introvert rather than an extrovert and when they lose their all and their hour seems blackest they stand in dumb and stunned silence, rather than screaming to the capacity of their lungs, makes their suffering no less acute, and can deprive them under proper circumstances of no less credence than the female who becomes hysterical in recounting the facts of her ravishment. This is a common characteristic among persons where the vicissitudes of life have from infancy brought about everything but cheerfulness and a normal existence and a sound foundation for hopefulness of a brighter day. Their emotional reactions often may be quite different from those whose environment and circumstances have been more favorable.

The statements voluntarily given and made by the defendants to the policewoman contradicted each other, but Goff did admit that he and Kidd did drive Nadine home the night in question, but he refused to tell what happened when they were in the country. He admitted taking her home at the time she stated. Of course, Kidd when questioned by the policewoman denied ever having seen Nadine or ever having accompanied her and Goff to her home. The entire evidence and circumstances, and the inferences reasonably deducible therefrom, are all corroborative of the testimony of Nadine Huckleberry, and support the conclusion reached by the jury that the defendants were guilty of the crime for which they were charged? The crime charged is one where the maximum penalty is death, and the minimum penalty is fifteen years in the State Penitentiary.

We conclude that under the authorities cited as applied to the facts stated, the court did not err in overruling the demurrer of the defendants to the evidence of the state.

Considering now the admissibility of the quoted evidence shown to have been stricken, for the purpose already stated, and no other, it appears from the record to have been the theory of the court that because the information did not contain an allegation that the rape was accomplished by threats of immediate and great bodily harm, accompained by apparent power of execution preventing resistance, that all evidence of threats of great bodily harm were inadmissible. Even

though the information was defective in the respect mentioned, all statements and threats and actions conducive to the creation of fear in the victim at the scene of the rape were admissible as part of the res gestae. See Price v. State, 1 Okla. Cr. 358, 98 P. 447, 452; where it is stated:

"Res gestae means the circumstances, facts, and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character."

And see Chastain v. State, 46 Okla. Cr. 123, 287 P. 826; Frazee v. State, 79 Okla. Cr. 224, 153 P. 2d 637; Hathcox v. State, 94 Okla. Cr. 110, 230 P. 2d 927.

Further, when the girl testified that the defendant A. J. Kidd at the time the defendant Goff was trying to rape her: "He told me if I didn't shut up he was going to kill me with that beer bottle", and then the jury was excused and the county attorney read the information, the court in the interest of justice should have permitted or suggested to the county attorney that the information be amended instanter to conform to the proof. Under the statute in question, this was permissible in one count. See Huckleberry v. State, 64 Okla. Cr. 396, 81 P. 2d 493.

The defendants finally contend that the closing argument of the county attorney was inflammatory and prejudicial and unduly influenced the verdict of the jury. The entire argument of the county attorney appears in the record, but we note that counsel for the defendants did not object to any of the argument except that when the county attorney attempted to illustrate a point by referring to one or more jurors by name. The court sustained defendants' objection to that, and advised the county attorney that he could not so illustrate his argument. The record discloses no further objection was interposed.

This court has held that not only does the argument of a county attorney objected to as improper have to be reflected in the case-made, but that any portion deemed improper must be objected to at the trial, and exception saved to an adverse ruling. Cooper v. State, 61 Okla. Cr. 318, 67 P. 2d 981; Quitman v. State, 35 Okla. Cr. 245, 250 P. 441; Tucker v. State, 9 Okla. Cr. 587, 132 P. 825. The remarks complained of not having been objected to and excepted to at trial and the court not having been afforded the opportunity to pass on such objections, and a careful reading of the statements now claimed to be error appearing not to have constituted fundamental error, the objections came too late.

While from a consideration of the evidence as a whole, we have reached the conclusion that the proof, stripped of the stricken evidence of threats, shown to have been accompanied by apparent power of execution, was sufficient to withstand the demurrer interposed, there is no doubt but that the case was considerably weakened, and although the court presumably did not consider such evidence in fixing the punishment, still, with the proof shorn of such stricken evidence, it would appear that the penalty assessed of 25 years imprisonment is excessive. And while on a new trial, with the jury permitted to consider the stricken evidence, a much severer penalty might be meted out, still, having concluded that there was sufficient evidence for the case to be submitted to the jury, it must be affirmed, except that it is our conclusion by reason of the circumstances stated, that the penalty be reduced to a term of 15 years in the penitentiary for each defendant, instead of 25 years, and the judgment as so modified is affirmed.

BRETT, J., concur. JONES, J. dissents.

BRETT, J. I concur in the opinion of the Presiding Judge. As was said in Harris v. State, 88 Okla. Cr. 413, 204 P. 2d 310:

"This is not as strong a rape case as many we have reviewed * * *. However, the jury heard the witnesses, saw their demeanor on the witness stand and on the disputed questions of fact have held against the accused."

The Harris case and the case at bar bear marked similarity. In the Harris case the defendant said, that "many people got killed that way when they didn't give in when they were supposed to." Here the victim testified, without objection, "I was afraid that they was going to kill me". In this case the defendants elected not to testify in their own behalf, and as was said in the Harris case, "the female in stating the occurrence says that she did not consent and did resist until resistance became so useless as to warrant its cessation". As was said therein, "can this Court after the jury have accepted her version of the transaction and the trial court has approved the verdict, say as a matter of law that there was no competent evidence to sustain the verdict of the jury." Therein we said, "We think not." Particularly is this conclusion applicable herein where the defendants did not take the stand in their own behalf and dispute the victim's testimony. Moreover, the element of fear was greatly enhanced due to the fact that there were two men involved in this situation and not just one. This fact alone supplies an element of force, by numbers. Hence there was both force and fear.

The dissenting opinion sets out the defendants should have been charged in separate informations and tried separately, as each act of sexual intercourse by these two individuals were distinct offenses. This is technically correct, but is a matter that the defendants did not raise in the lower court, and have not raised in any stage of the proceedings, and are not asserting here. Of course, it is a matter that they alone could raise, and their failure so to do amounts to a full and complete waiver. In view of these and other impelling motives, I therefore concur in the opinion of the Presiding Judge.

JONES, J. (dissenting). Having concurred in the original opinion which was rendered on September 2, 1953, and now dissenting to the revised opinion, I feel that I should briefly state the reasons for such dissent. The original opinion affirming the sentence was based largely upon evidence which had been stricken by the court. Our attention was called to this in the petition for rehearing, as pointed out in the opinion hereinabove set forth by Judge Powell. I concur with the majority opinion in conformity to the decisions therein cited that the evidence which was stricken from the consideration of the jury may not be considered by the appellate court in determining the sufficiency of the evidence to sustain the conviction, even though the members of the appellate court might feel that the court acted erroneously in striking such evidence from the consideration of the jury. The court struck from the consideration of the jury the evidence of submission through fear engendered by threats because such was not charged in the information.

With the elimination of the stricken evidence, there does not appear to be any substantial, competent evidence to show that the prosecuting witness resisted and that her resistance was overcome by force and violence.

The state relied for a conviction against both Goff and Kidd on separate acts of sexual intercourse, each had with the prosecutrix. These defendants should have been charged in separate informations and tried separately as each act of sexual intercourse committed by these two individuals were distinct offenses.

Before a conviction can be upheld, the state's evidence must establish beyond a reasonable doubt that the prosecutrix resisted, but her resistance was overcome by force and violence as defined under the fourth subdivision of the statute. 21 O.S. 1951 § 1111.

I concur in the statement of the majority that the principle of resistance to the uttermost is obsolete and is not followed in the latest decisions of this court. However, it is equally well settled by the decisions of this court that there must be some real resistance in good faith and not a mere resistance or sham, and such resistance should persist until the offense is consummated. That resistance or objection by mere words is not enough; the resistance must be by acts, and must be reasonably proportionate to the strength and opportunities of the woman. If there is a lack of resistance, there is small occasion to use force. Gullatt v. State, 80 Okla. Cr. 208, 158 P. 2d 353; Johnson v. State, 52 Okla. Cr. 397, 5 P. 2d 772; Epley v. State, 94 Okla. Cr. 308, 235 P. 2d 711.

With these principles of law established, I here present a summary of the evidence against each of the accused; first, as to George Goff. Goff and the prosecuting witness had been acquainted for three or more years and had dated. They were of the same approximate age. The prosecutrix was a physically strong, able-bodied young woman, being employed as a janitress. The prosecutrix testified that Goff pushed her into the back seat of the car, jerked off her half-slip, and had sexual intercourse with her without removing her panties. In response to the question as to what she did to resist, her answer was, "Well, sir, I just begged and I pleaded. I didn't know much I could do."

She testified that the act was painful to her and that she told Goff that it was painful and "Pat" Goff told her "to lay still". At no time in her testimony does she make any statement of any act that she did to show resistance. Not only was there not resistance to the uttermost, there just was not any resistance. As I view the record, the most favorable thing that can be said pertaining to her act with Goff was that she was a reluctant participant.

Next consider the evidence as to Kidd. Kidd was not present but was away in the darkness somewhere during all of the acts allegedly committed by Goff. Her complete testimony concerning Kidd's force and her resistance is set forth in the following questions and answers:

"Q. After Pat Goff accomplished this act, then what was the next thing happened? A. Well, he got out of the car and went around the back and A. J. Kidd come in and I had sat up, and he told me to lay down, *that he wasn't gonna hurt me* and he told me not to tell Pat Goff, and he had a sexual intercourse too. Q. Did you object to him? A. As well as I could, sir."

Did Kidd force her to commit the act? She says that he told her to lay down, that he was not going to hurt her. Such statement sounds to me more like an attempt to use persuasion to accomplish the act than the use of force and violence, which the state alleges was used. Not one act of resistance on her part is related as to Kidd, and so far as the defendant Kidd is concerned, there is absolutely a complete lack of any substantial evidence to convict him.

It appears to me that the majority opinion is still giving effect to the evidence of fear engendered by alleged threats which evidence was stricken by the court. Although the majority state in their opinion that they are not giving consideration to such evidence, it is again set forth in the opinion and apparently is affecting their decision. The stricken evidence and the fact that the proof of the state shows the prosecutrix was a virgin is the basis for the affirmance of the judgment. It is regrettable that a virgin was violated, and I do not condone nor approve the acts of the defendants, but under the statute and the decisions of this court under which the prosecution was instituted, it is contemplated that even an adult virgin must show some active resistance before a conviction should be sustained. A person may be a virgin solely because no opportunity ever was presented to be otherwise.

But a virgin must resist the assault. Under the statute there is no difference in the penalty from having sexual intercourse with a virgin or with a prostitute, where there is resistance and the act is consummated by the use of force and violence. The fact of virginity is important and a factor to be considered, but where her actions at the time of the alleged assault, coupled with her failure to make an outcry at the first opportunity, repudiates any idea of resistance or the overcoming of resistance by the use of force and violence, then virginity loses much of its significance in determining the guilt or innocence of the one accused in the assault.

It has been repeatedly stated by decisions of this court that it is the natural impulse of every virtuous female to make complaint of an outrage at the first opportunity and where this is not done there is a strong presumption against the truth of the accusation. Gullatt v. State, supra. Not only did the prosecutrix fail to make an outcry at the first opportunity after she arrived home, but she testified that she would not have told her mother what had occurred if her mother had not awakened and scolded her for being out so late. In this connection the prosecutrix testified that the defendants drove up to the front of her home and Pat Goff got out of the car with her. Instead of making an outcry the prosecutrix went to the back door so she could enter without attracting attention.

Dr. Beddoe, who examined the prosecutrix the night of the alleged attack, testified at the preliminary examination concerning the girl's appearance when he examined her, approximately two hours after the alleged attack, as follows:

"Q. What was the girl's mental attitude, and physical attitude, if any? A. She seemed not in any way hysterical. She was not hysterical or unduly upset when I examined her. Q. She was not upset or hysterical at all? A. No."

Keeping in mind that this is a prosecution for rape by the use of force and violence overcoming the resistance of a woman, attention is directed to the fact that there was no great disproportion in the ages or sizes of the prosecutrix and the accused so far as shown by the record. We have had a great number of rape cases appealed to this court in which learned doctors have testified, and based on this abundance of authority, it seems to be unquestioned that a female not wishing to be raped is equipped to interpose most effective obstacles by means of hands and limbs and pelvic muscles. Most medical writers state that these obstacles are practically insuperable in the absence of more than the usual relative disproportion of age and strength between man and woman.

Summarizing, there is a lack of evidence of any force overcoming resistance. All that prosecutrix did was beg and plead and on the one occasion when she complained of the pain because of the act, her boy-friend Goff told her to lay still and she still laid.

I am of the opinion that the proper disposition of this case calls for it to be reversed and remanded for a new trial with instructions to the county attorney to amend the information by alleging that prosecutrix was prevented from resistance by threats of immediate and great bodily harm accompanied by apparent power of execution.