[Crim. No. 34995. Second Dist., Div. Four. Oct. 7, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHNNY GASTELO LOPEZ, Defendant and Appellant.

COUNSEL

Russell Iungerich, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOODS, J.**—Defendant was tried by a jury and convicted of murder, attempted murder, rape, and sodomy. The jury found true the allegations that defendant was armed with a firearm at the time of the commission of each offense. Defendant was sentenced to state prison for a total of 16-1/3 years, with count II, attempted murder, as the principal term.

These convictions arose out of an incident in Ventura County wherein three young men assaulted a young couple late one night on the grounds of an Oxnard high school. The young man was murdered and

the young woman assaulted and sexually molested. Following the granting of a motion for change of venue, appellant Lopez was tried and convicted in Los Angeles County. Each of the three defendants was separately tried and convicted.[1]

Appellant raises the following contentions on appeal:

1. The eyewitness identification of the victim is not substantial evidence in support of conviction, her memory having been refreshed through hypnosis.

2. There is insufficient evidence to support the conviction for sodomy.

3. The testimony of Elva Almanza was improperly admitted as a declaration against penal interest.

4. Appellant's statements to a police detective were improperly admitted into evidence.

5. The seven-year sentence for attempted murder was erroneous.

6. The four enhancements for having been armed with a weapon violate Penal Code section 654.

7. The consecutive sentences imposed on the subordinate terms were incorrectly calculated.

On October 14, 1977, Paul Y. and Linda F., aged 17 and 18, were engaged to be married. At approximately 9:40 p.m. that evening, they left Paul's house together so that Paul could walk Linda home. They crossed through Channel Islands High School and passed three male Mexicans near the school cafeteria. The three men were later identified as appellant Johnny Lopez, Ruben Torres, and Anthony M. It was light in the cafeteria area, and Linda positively identified appellant as one of the three men. The men said something unpleasant to Paul and Linda; Paul responded and then he and Linda walked out to the mound on the football field.

---

[1]Ruben Torres' conviction was affirmed in 2 Crim. No. 34550; Anthony M.'s conviction was affirmed in 2 Crim. No. 33877.

They sat on the mound and talked and made love. After the act of sexual intercourse, and after having replaced their clothing, Linda looked at her watch and saw that it was 10:35 p.m. At that time, the three men ran up to the couple, and Torres began striking them both in the head with some hard object. Torres then sat on Linda's stomach and held her down while appellant and Anthony M. continued to hit Paul on the head. Linda screamed; Torres hit her in the face and stuffed her bra into her mouth to stop her screaming. Torres removed a handgun from his back pocket and threw it to appellant. Appellant caught it and hit Paul in the face with it several times. Paul fell back to the ground; appellant and Anthony M. continued hitting him, and Paul lay still.

All three men raped Linda in turn. While one raped her the other two held her down. She saw clearly the face of each attacker. The men then turned her onto her stomach and she was sodomized at least once and possibly more than once. She was struck with the handgun and their hands repeatedly throughout the sexual attacks. The men stuffed something up her vagina which was painful, but she did not know what it was. She was then dragged from the mound by her ankles around the field, during which time she lost consciousness. She testified at trial that she was positive appellant did most of the hitting.

At approximately 7 o'clock the next morning, Louis Urango came to check a cabbage field, which was adjacent to the high school field, for irrigation. He heard moaning and saw Linda's body lying in a ditch on the high school grounds. He saw a bra stuffed in her mouth and observed injuries on her face and body. He called the police.

Linda was taken by ambulance to a nearby hospital. She was nude except for a pair of socks, and her entire body was covered with blood, debris, dirt and grass. She was semiconscious and could not respond verbally. She moved only in response to deep pain. She was in imminent danger of dying because of shock, exposure and a depressed skull fracture which required surgery. Her condition was "critical." The medical examination conducted at the hospital indicated that Linda had been brutally sexually assaulted. Her vagina and rectum were packed with debris and grass, including bits of sticks, stones and pieces of sod. The doctor described Linda's injuries as "life threatening."

Paul died as a result of a depressed skull fracture caused by blunt force, possibly by the butt of a gun.

I

Appellant challenges the sufficiency of the identification evidence offered by the victim. He contends that the testimony is not reliable, her memory of the identity of her attackers having been refreshed through a process of hypnosis. Although no California cases[2] have directly addressed the issue of the reliability or admissibility of testimony by a witness whose memory has been hypnotically refreshed, appellant cites two out-of-state cases which have recently concluded that such evidence is not reliable. (*State* v. *La Mountain* (1980) 125 Ariz. 547 [611 P.2d 551]; *State* v. *Mack* (1980) — Minn.Rptr. — [292 N.W.2d 764].)[3]

■ We do not directly address the issue raised by appellant, because the facts of this case demonstrate that the victim's memory was refreshed not through hypnosis but through the healing effects of the passage of time. Linda did not regain consciousness until sometime near the end of October 1977. At that time, she did not remember what had happened to her. She had no memory of the events of October 14, and spoke of her fiance as if he were still alive. During the week following her return to consciousness, Investigator Smart visited her in the hospital on numerous occasions in an attempt to acquire information about the night in question. She began to remember some details about the early part of the evening of October 14, but nothing about the crime. She was released from the hospital on November 11. Linda's parents would not let her read newspaper accounts of the attack; her father clipped articles about it from the paper and kept them from Linda for several months.

Dr. Raymond La Scola testified that he is a physician specializing in the field of hypnosis. He teaches clinical hypnosis at UCLA and testified to his extensive background and experience in the area. Upon learning of the Ventura crime, he concluded that he might be of assistance in refreshing the victim's memory and volunteered, without charge, to conduct hypnotic sessions. He conducted four hypnotic sessions with the victim, three at her home in Oxnard and one at his home in Malibu. All of the interviews were tape recorded. The interviews were conducted on November 16, 17, 23 and December 7, 1977. Al-

---

[2]The issue of the conditions under which hypnotically refreshed testimony may be admitted in evidence is currently pending before the California Supreme Court in *People v. Johnson*, Crim. 21624, and *People v. Titman*, Crim 21625.

[3]For a comprehensive discussion of this issue, see Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness* (1980) 68 Cal.L.Rev. 313.

though Dr. La Scola was convinced that the victim was in fact under hypnosis during each interview, he concluded that the story she related about the crime was a lie. She invented a story about a fat man in a car who approached her and Paul. She told that story during each session, but there were sufficient discrepancies and improbabilities in the story so that the doctor concluded that it was untrue. There was never any discussion of, or reference to, the three defendants.

Linda testified that she had lied under hypnosis because she was frightened of retaliation by the defendants if she told the truth; she was embarrassed and ashamed about the nature of the acts committed on her and was afraid that she would lose the respect of her parents and Paul's parents if they learned that she and Paul had made love prior to the incident. The doctor testified that a person in a state of hypnosis is able to lie, and will lie for the same reasons he would lie in a nonhypnotic condition. If a topic were extremely painful to discuss, the subject might well lie to avoid talking about it. The victim testified that she knew at the time of each session that she was lying, but she was afraid and did not want to tell anyone what had really happened.

The last hypnotic session was conducted on December 7. At that time, the victim was shown 18 photographs divided into 3 groups. There was a picture of one defendant in each group. She identified no one.

Sometime after the last hypnotic session, the victim experienced a nightmare concerning the events of the crime. She thereafter admitted to Officer Smart that she had been lying in the earlier interviews, that she could in fact identify her assailants but that she was afraid to do so. A few days later, she told Officer Smart of the encounter with the three young Mexican men and that a gun had been used to strike her and Paul. She admitted that she had been raped, but became extremely upset and would recite no further details. Two days later, she told Officer Smart that she was able to recall more and more of the incident as time went on. That day she remembered hearing one of the defendants call appellant "Johnny." On January 10, the victim told Officer Smart that she now remembered everything, but she could not discuss it with him. On January 11, the victim was interviewed by a female officer. She told the female officer all of the details concerning the event and immediately selected all three defendants from photographic lineups.

Expert testimony was introduced to the effect that the passage of time makes painful incidents less difficult to relate and easier to remember.

The foregoing facts demonstrate that the hypnotic sessions were not instrumental in refreshing the victim's memory. On the contrary, throughout those sessions she continued to repeat a fabricated tale. The victim's testimony that her memory was refreshed gradually with the passage of time, and that the improvement in her recollection was independent of the hypnotic sessions, is uncontradicted. Therefore, her identification of defendant as one of the perpetrators of the crime, both from photographs and in person, does not suffer from whatever infirmities might be created by hypnotic suggestion.[4]

## II

█ Appellant contends that the record does not contain sufficient evidence to support the conviction on the count of sodomy. He asserts that there is no evidence that the penetration of the victim's anus was accomplished by a penis. This assertion is grounded on the allegedly inadequate testimony of the victim. During direct examination, the prosecutor asked her, "Do you know what sodomy is?" She answered, "Yes." He then asked, "Did anyone perform sodomy on you." She answered, "Yes."

Appellant argues that this conclusory statement does not establish the elements of the offense, to wit, sexual contact between penis and anus, and refers to expert testimony offered at the trial indicating some doubt as to the identity of the instrument which penetrated the victim's anus.

Appellant's argument in this regard is not persuasive. We have concluded that the victim's testimony is sufficient to establish that the crime of sodomy was committed. Any uncertainty as to whether the victim knew the meaning of the word sodomy should have been explored on cross-examination by defense counsel. Further, the victim's testimony was sufficiently corroborated by expert witnesses.

It is not uncommon that a prosecutor's concern for the delicate feelings of a victim will produce abbreviated testimony with respect to

---

[4] A tape recording of the November 23 hypnosis session was played in open court, and a transcript of that session has been reviewed by this court. That interview, which the evidence establishes was typical of all four interviews, demonstrates that no facts concerning the details of the crime were suggested to the victim.

sexual conduct. Several California cases have addressed issues similar to the one presented here. In *People v. Scott* (1969) 270 Cal.App.2d 773, 776 [76 Cal.Rptr. 117], and *People v. Walls* (1978) 85 Cal.App. 3d 447, 454 [149 Cal.Rptr. 460], the court concluded that a victim's testimony that sexual intercourse had taken place against her will was sufficient to establish that the crime of rape had been committed. Both courts concluded that if there was any doubt as to whether all of the elements of the offense had been committed, particularly whether penetration occurred, "'defendant's counsel should have pursued that question further.'" (*People v. Walls, supra*, 85 Cal.App.3d at p. 455.)

In the instant case, the only question posed by defense counsel concerning this offense was the following, "And did the sodomy occur there also on the mound?" If defense counsel believed, as is now asserted, that she might have confused sodomy with rear-entry intercourse, that should have been explored with the witness during cross-examination. This reviewing court can only assume that the jury believed the witness' testimony.

Several medical experts testified to their findings resulting from physical examinations of the victim. Dr. Woodling testified that he discovered lacerations of the rectum, clearly the result of penetration by a foreign object. It was his opinion that the lacerations could have been caused by any sharp object, but that the erythema, a reddening deep within the rectum, was caused by a penis. Dr. Cyril Wecht, a defense witness, testified that the injuries he saw could have been produced by penetration by a penis, and Dr. Breitenecker testified that the injury to the anus was consistent with sodomy, which he defined as penile insertion.

Finally, we note that the victim testified that she was examined by Dr. Woodling five or six times after the incident. During one examination, she asked him whether she had been sodomized "and he said that he could tell about the way my butt was." That testimony indicates that the victim knew and understood the meaning of the term sodomy. There was substantial evidence to support defendant's conviction on this count.

### III

Appellant contends that the testimony of Elva Almanza was improperly admitted as a declaration against penal interest. Elva Almanza was

the girl friend of Ruben Torres at the time the crime was committed. She testified to the contents of a telephone conversation she had with Ruben Torres the morning after the crime. The testimony was deemed admissible on two theories: some of the statements were found to be declarations against the penal interests of Ruben Torres, who was unavailable because he had asserted his Fifth Amendment privilege against self-incrimination and had refused to testify. Other statements were found not to be offered for their truth, and thus not hearsay at all, but offered only to prove that Torres was present at the time the crimes were committed.

During early investigation of this offense, appellant told Officer Elliot that, on the night in question, he, Torres and Anthony M. went to a drive-in movie together; that they had been together all day and got home at about 12:30 that night. The three went to appellant's home together and all three slept at appellant's house that night. The relevancy of the Almanza testimony in the Lopez trial is clear: Torres' statements that he had been present at the scene of the killing plainly implicate appellant.

■ Appellant argues that Torres was not properly ruled unavailable, and since unavailability of the declarant is a necessary prerequisite to admission of a declaration against interest (Evid. Code, § 1230), the witness' statements should have been found inadmissible hearsay. Appellant takes the position that Torres could not properly invoke his privilege against self-incrimination, having already been tried and convicted of the very offenses to which his testimony relates. Appellant states that by taking the stand and testifying at his own trial, Torres waived his Fifth Amendment privilege not just for that trial, but for any subsequent proceedings. Appellant recognizes that California has adopted the single-proceeding rule with respect to Fifth Amendment waivers: that a waiver of his privilege against self-incrimination is effective only in the proceeding in which the person testifies. (See, e.g., Witkin, Cal. Evidence (2d ed. 1966) Witnesses, § 911(c), p. 846.) However, he notes that all of the California cases establishing this principle involve subsequent proceedings against the same defendant. For example, a witness does not waive the privilege against self-incrimination at trial by voluntarily testifying at either a preliminary hearing or a grand jury proceeding. (See, e.g., *Overend* v. *Superior Court* (1900) 131 Cal. 280, 284 [63 P. 372]; *People* v. *Maxwell* (1979) 94 Cal.App.3d 562, 570 [156 Cal.Rptr. 630].)

Appellant argues that the purpose of the single-proceeding rule, to protect a criminal defendant from further incriminating himself in subsequent proceedings, should not be extended to afford a privilege not to testify in a trial of a codefendant.

In the case before us Torres had appealed from his conviction, and his appeal was pending at the time of the Lopez trial. Therefore, were the Torres appeal to result in a reversal of his conviction and retrial, any testimony offered by him at the Lopez trial could be introduced in evidence against him as an admission. It is conceivable that interrogation by the prosecutor and defense attorney in the Lopez trial could have elicited evidence from Torres which had not been presented at his first trial. Thus, any testimony presented in the Lopez trial could tend to incriminate him. Under those circumstances, he is entitled to assert his Fifth Amendment privilege.

The Supreme Court has stated, in dictum, in *Ex parte Cohen* (1894) 104 Cal. 524, 527 [38 P. 364], that a witness' privilege against self-incrimination is lost once he has been tried and convicted and "has satisfied the sentence of the law;..." (*Id.*, at p. 528.) Subsequent California cases have cited the *Cohen* dictum without directly addressing the issues presented here. (See, e.g., *People* v. *Webster* (1971) 14 Cal.App.3d 739, 743 [93 Cal.Rptr. 260]; *People* v. *Shipe* (1975) 49 Cal.App.3d 343, 349 [122 Cal.Rptr. 701]; *People* v. *Kizzee* (1979) 94 Cal.App.3d 927, 938 [156 Cal.Rptr. 784].) Courts in other jurisdictions have held that the pendency of an appeal shields a witness from a requirement that he testify at the trial of a codefendant. (*State* v. *Johnson* (1955) 77 Idaho 1 [287 P.2d 425]; *People* v. *Den Uyl* (1947) 318 Mich. 645 [29 N.W.2d 284, 2 A.L.R.2d 625]; *Mills* v. *United States* (4th Cir. 1960) 281 F.2d 736.)

We conclude that a witness who has been convicted of a crime and who has appealed that conviction cannot be compelled to testify in the trial of a codefendant pending the resolution of that appeal. The testimony to be elicited could adversely affect the witness if the appeal were to result in a new trial. The trial court properly denied the People's motion to call Torres as a witness and properly overruled defense objections to the admissibility of Almanza's testimony. Torres was unavailable within the meaning of Evidence Code section 1230, and his statements were admissible either as declarations against interest or as nonhearsay declarations establishing his presence at the scene of the crime.

## IV

■ Appellant contends that statements he made to Detective Skeeters should have been ruled inadmissible. On October 22, 1977, appellant was at the Oxnard Police Department for questioning. He was waiting in a detective's office with Investigator Jaime Skeeters. Skeeters was not questioning him. Appellant said to Skeeters, "Why don't they believe my story about the murder?" Skeeters responded that he was a narcotics detective and did not know much about the case. After a pause, appellant stated, "I hope she dies. I hope she dies. I hope she really dies." He then added, "I mean it." The detective asked, "Why?" and appellant responded, "Because of all the trouble I am in over her." He then stated, "I will kill anybody who says I killed them." The court overruled defendant's objections to the admissibility of the foregoing statements and observed that the statements were spontaneous. Appellant now contends that the statements were inadmissible hearsay and that they do not qualify as "spontaneous statements" pursuant to Evidence Code section 1240.

We are convinced that the court's observation that the statements were spontaneous was not a ruling that they qualified under that particular hearsay exception. Rather, it was apparently in response to assertions that the statements were elicited without benefit of any *Miranda* warnings by Detective Skeeters. But even if the trial court were mistaken as to the correct hearsay exception to apply to these statements, it would make no difference for purposes of appellate review. If the decision of the lower court to admit the evidence is correct, the order will be affirmed regardless of the correctness of the grounds upon which the court reached its conclusion. (*Davey v. Southern Pac. Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

The defendant's statements are clearly admissible under the hearsay exception for admissions. The declarations of a party defendant offered against him are not made inadmissible by the hearsay rule. (Evid. Code, § 1220; *People v. Panky* (1978) 82 Cal.App.3d 772, 776 [147 Cal.Rptr. 341].)

Nor is there validity to appellant's contention that the statements should have been excluded pursuant to Evidence Code section 352. The statements are, of course, prejudicial to defendant, but the trial court's conclusion that their prejudice was outweighed by their relevancy is a reasonable one. The defendant's wish that the surviving eyewitness

would die creates a strong inference that he knew she might otherwise identify him. His threat to kill anyone who accused him of the crime indicates a strong consciousness of guilt. Both statements are undeniably relevant to the case at bar, and the court did not err in denying defendant's motion to exclude the evidence.

## V

■ Appellant contends that the court erred in imposing a seven-year sentence for count II, the attempted murder of Linda F. Appellant's argument in this respect is twofold. First, he asserts that, because the court did not fix a degree of the murder attempted, it must be treated as attempted second degree murder, which carries a lesser term. We need not reach this contention, however, because we are persuaded by appellant's second argument, that the court should have imposed punishment pursuant to Penal Code section 217 rather than sections 187 and 664.

The seven-year punishment which was imposed in this case was calculated pursuant to Penal Code section 664 which, at the time of the offense, provided for a maximum term of five, six or seven years in state prison for an attempt to commit an offense punishable by life imprisonment. Penal Code section 217, at the time of the offense herein, provided that every person who assaults another with intent to commit murder is punishable by imprisonment in the state prison for two, three, or four years. Appellant was not charged with assault with intent to commit murder. Rather, he was charged with and convicted of attempted murder, in violation of Penal Code sections 187 and 664. Nonetheless, the attempted murder was committed by means of an assault. Where there is no evidence of any attempted murder other than an assault with intent to murder, defendant is entitled to be punished under the more specific statute which expressly proscribes the conduct in which he engaged. Penal Code section 664 defines and punishes attempted crime. That section provides punishment "where no provision is made by law for the punishment of such attempts, . . ." Attempted murder by assault is not a crime for which no provision is made by law for punishment.

Penal Code section 664 must be limited in application to those cases wherein no provision is made under the law for punishment of the particular crime attempted. (See *In re James M.* (1973) 9 Cal.3d 517, 522 [108 Cal.Rptr. 89, 510 P.2d 33].) A defendant who is found guilty of

attempted murder, which attempted murder was committed by means of assault, must be punished under the more specific provisions of Penal Code section 217. (*People* v. *Gray* (1979) 91 Cal.App.3d 545, 557-558 [154 Cal.Rptr. 555]; *People* v. *Montano* (1979) 96 Cal.App.3d 221, 228 [158 Cal.Rptr. 47].)[5]

The matter must, therefore, be remanded for resentencing. Appellant cites *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677], to support his contention that he cannot receive a greater sentence following remand for resentencing than was originally imposed. However, the *Henderson* rule has no application where the sentence imposed is void. As noted by the Supreme Court in *People* v. *Serrato* (1973) 9 Cal.3d 753, 764-765 [109 Cal.Rptr. 65, 512 P.2d 289]: "In the *Henderson* case, as in each of the cited cases which followed it, the sentence imposed after the first trial was a lawful one, within the limits of the discretion conferred by statute for the offense of which the defendant had been convicted. The judgments pronounced at the first trials were reversed because of errors having nothing to do with the sentences. [¶] The rule is otherwise when a trial court pronounces an unauthorized sentence. Such a sentence is subject to being set aside judicially and is no bar to the imposition of a proper judgment thereafter, even though it is more severe than the original unauthorized pronouncement....[¶]...[A] defendant who successfully attacks a judgment which is in excess of the court's jurisdiction is not necessarily entitled to claim the protection of that invalid judgment as an absolute limitation upon what the court may do thereafter."

Count II, attempted murder, when properly sentenced pursuant to Penal Code section 217, even with enhancements for having been armed

---

[5]We recognize that there exists an anomaly in the law, in that the punishment for violation of Penal Code section 217 is substantially less than the punishment for violation of sections 187 and 664. This can result in more severe punishment being imposed for less onerous conduct. For example, in *People* v. *Parrish* (1948) 87 Cal.App.2d 853 [197 Cal.Rptr. 804], defendant was arrested outside his victim's home with a loaded gun. He was charged with and convicted of attempted murder. Had he entered the home and shot but not killed his intended victim, he would have been properly sentenced under Penal Code section 217 for assault with intent to murder, carrying a lighter penalty. We join in the hope expressed in earlier cases that the Legislature will recognize and rectify this sentencing aberration.

with a weapon and for the infliction of great bodily injury, may no longer be the count providing for the greatest term of imprisonment.

## VI

Appellant's three remaining contentions address the propriety of particular details of the sentence imposed. Inasmuch as we have concluded that the entire sentence was void, we do not address these remaining issues. Any argument concerning the proper calculation of principal and subordinate terms or the language regarding the time when stays become permanent may properly be addressed to the trial court at the time of resentencing.

The matter is remanded for resentencing. In all other respects, the judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied October 28, 1980, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied December 24, 1980.